**UNITED STATES of America, Appellee,**

v.

**Staniford A. SORRENTINO, Defendant, Appellant.**

No. 83–1260.

United States Court of Appeals, First Circuit.

Argued Dec. 5, 1983.

Decided Jan. 31, 1984.

Memorandum and Order of April 10, 1984.

Francis J. DiMento, Boston, Mass., with whom DiMento & Sullivan, and Carolyn M. Conway, Boston, Mass., were on brief, for appellant.

Deborah Wright Dawson, Atty., Tax Div., Dept. of Justice, Washington, D.C., with whom Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, Robert E. Lindsay, Attys., Tax Div., Dept. of Justice, Washington, D.C., and William F. Weld, U.S. Atty., Boston, Mass., were on brief, for appellee.

Before CAMPBELL, Chief Judge, BOWNES, Circuit Judge, and MALETZ,* Senior Judge.

BOWNES, Circuit Judge.

Defendant Staniford Sorrentino is charged with eight counts of tax evasion for the years 1975, 1976, 1977, and 1978. In each year he is alleged to have willfully attempted to evade a substantial part of his individual federal income tax liability in violation of 26 U.S.C. § 7201, and also to have willfully subscribed a materially false small business corporation income tax return in violation of 26 U.S.C. § 7206(1). Following a thirty-day jury trial in the United States District Court for the District of Massachusetts, Sorrentino was convicted on all eight counts. On appeal, he challenges three jury instructions, sundry evidentiary rulings, the trial courtroom seating arrangement, and a Jencks Act ruling.

 The elements of attempted tax evasion under § 7201 are (1) an additional tax due and owing, (2) an attempt to evade or defeat that tax, and (3) willfulness. *Sansone v. United States*, 380 U.S. 343, 351, 85 S.Ct. 1004, 1010, 13 L.Ed.2d 882 (1965). The Government makes out a prima facie case under the net worth method of proof if it establishes the defendant's opening net worth (computed as assets at cost basis less liabilities) with reasonable certainty and then shows increases in his net worth for each year in question which, added to his nondeductible expenditures and excluding his known nontaxable receipts for the year, exceed his reported taxable income by a substantial amount. *See Holland v. United States*, 348 U.S. 121, 125, 75 S.Ct. 127, 130, 99 L.Ed. 150 (1954); *McGarry v. United States*, 388 F.2d 862, 864 (1st Cir.1967), *cert. denied*, 394 U.S. 921, 89 S.Ct. 1178, 22 L.Ed.2d 455 (1969). The jury may infer that the defendant's excess net worth increases represent

---

* Of the United States Court of International Trade, sitting by designation.

unreported taxable income if the Government either shows a likely taxable source, *Holland,* 348 U.S. at 137–38, 75 S.Ct. at 136, or negates all possible nontaxable sources, *United States v. Massei,* 355 U.S. 595, 78 S.Ct. 495, 2 L.Ed.2d 517 (1958); the jury may further infer willfulness from the fact of underreporting coupled with evidence of conduct by the defendant tending to mislead or conceal. *Holland,* 348 U.S. at 125, 75 S.Ct. at 130.

In the present case, the Government conducted an extensive pretrial investigation of Sorrentino's financial affairs for the years in question. Government agents interviewed the defendant, his two sisters, his business associates and contacts, and numerous bank and commercial employees who dealt with Sorrentino. The agents analyzed the defendant's banking and investment accounts in detail to ascertain the nature and extent of his assets and liabilities. They also checked local real estate and probate records, as well as the IRS's own records. The investigation showed that Sorrentino held or acquired the following major assets, among others, during the indictment years: telephone bonds and Treasury notes; three parcels of improved real estate, including a new home constructed by Sorrentino in 1975–79 at a cost of over $330,000; and undistributed income from the Crown & Anchor, a motel with several bars of which Sorrentino was manager and half owner. There was also documentation of substantial personal, nondeductible expenditures for automobiles, antiques, and travel. Aside from a $5,000 trust fund and some jewelry valued at $8,000 left him in his mother's will twenty years previously, there were no records of gifts or inheritances.

■ The results of the Government's investigation were summarized in a net worth and expenditures schedule based on evidence admitted at trial and revised in the course of the trial to reflect the testimony actually given before the jury. The net worth schedule shows an opening net

worth for Sorrentino of $17,074.86 on December 31, 1974, with increases in the following amounts in the indictment years: $46,752.56 in 1975; $13,198.44 in 1976; $74,767.19 in 1977; and $70,602.19 in 1978. This translates, according to the Government's calculations, when nondeductible expenditures are added and nontaxable receipts subtracted, to the following figures for taxable income: $110,194.17 in 1975; $31,223.11 in 1976; $90,352.92 in 1977; and $66,240.84 in 1978.[1] The corresponding figures reported as income by Sorrentino were: $10,979.60 in 1975; none in 1976; $5,378.00 in 1977; and none in 1979.

On the issue of the source of the unreported income, the Government offered the testimony of Robert Hedrick, the former general manager of the Crown & Anchor during the period in question. Hedrick testified that he observed the regular collection of substantial amounts of cash door receipts, which were not reported as income on the Crown & Anchor's corporate tax returns but instead were distributed under the table to Sorrentino and his co-owner. Hedrick also testified to the existence of a similar "skimming operation" with respect to the cash receipts from the Crown & Anchor bars, which were allegedly used to fund a cash payroll with the purpose of evading federal withholding taxes. Hedrick's testimony was corroborated in material respects by John Henry, another Crown & Anchor employee.

On the issue of willfulness, the Government showed not only a regular failure on Sorrentino's part to report taxable income from his securities and a complete failure to report income in previous years, but also a predilection for undocumented cash transactions and a pattern of registering his own assets in the name of his intimate friend, Chester Warner.

At trial, the principal defense was that the net worth increases and expenditures shown by the Government actually came not from the Crown & Anchor skimming

---

1. The amounts for 1977 and 1978 were revised during trial to $88,802.42 and $65,640.84, respectively. This does not affect the adequacy of the Government's proof, for the Government need prove only that the amount of tax evaded

was substantial. It is not necessary to prove the exact amount. *United States v. Nunan,* 236 F.2d 576 (2d Cir.1956), *cert. denied,* 353 U.S. 912, 77 S.Ct. 661, 1 L.Ed.2d 665 (1957).

operations, but from nontaxable sources which the Government failed to take into account, namely gifts and inheritances. Specifically, defendant claimed that he had received substantial cash gifts from his father, and that, after the father's death in January, 1976, he had received an inheritance of valuable antiques with a basis stepped up to fair market value. Although defendant produced some evidence of antique sales, he could not document their nontaxable nature, for all transactions had purportedly been made in cash, and both his father and the purchaser of his antiques were no longer alive.

■ We reject at the outset the notion that the Government's evidence was insufficient to go to the jury because of any failure to track down "leads" to nontaxable sources.[2] Defendant points to a newspaper article which mentioned in passing a statement made by Sorrentino to the effect that he had inherited his father's antique collection, and claims that this should have been treated by the Government as a lead. In his single pretrial interview with an IRS special agent, however, Sorrentino expressly denied receiving any gifts or inheritances except from his mother, and refused to offer any leads whatsoever concerning nontaxable sources of income. We hesitate in these circumstances to apply the leads doctrine at all. Even assuming, though, that the newspaper article provided a lead, we hold that the Government's exhaustive investigation of county probate registers, federal social security records, federal estate and gift tax returns and antique dealers' records was clearly adequate to support the Government's prima facie case. The investigation revealed no trace of a probated will or taxable estate for Sorrentino's father, much less a bequest of valuable antiques; rather, it indicated that Sorrentino's father lived in straitened circumstances and was dependent on social security payments. This supported the inference, apparently made by the jury, that Sorrentino's unreported receipts did not come from a nontaxable source such as gifts or inheritances. *See United States v. Goldstein,* 685 F.2d 179, 182 (7th Cir.1982); *United States v. Giacalone,* 574 F.2d 328, 332 (6th Cir.), *cert. denied,* 439 U.S. 834, 99 S.Ct. 114, 58 L.Ed.2d 129 (1978); *United States v. Penosi,* 452 F.2d 217, 219–20 (5th Cir.1971), *cert. denied,* 405 U.S. 1065, 92 S.Ct. 1495, 31 L.Ed.2d 795 (1972).

We now turn to the four areas in which the defendant assigns substantial error.

## I. JURY INSTRUCTIONS

In his charge to the jury, Judge Caffrey set forth the elements of attempted tax evasion under § 7201, and explained the Government's burden of proof under the net worth method. On the issue of taxable source, he stated: "The burden of proof is on the government to establish beyond a reasonable doubt that the funds reflected by his increased net worth or by his nondeductible expenditures came from taxable rather than nontaxable sources." He further explained that taxable income would include compensation for personal services, gain from business or commercial dealings, and interest or dividends, while nontaxable receipts would include gifts, inheritances, life insurance proceeds, loans, and reimbursement for purchases made on behalf of other people. Judge Caffrey properly instructed the jury that in deciding whether the Government had met its burden it should consider evidence of a likely source of taxable income and evidence tending to negate any nontaxable source, as well as any failure on the Government's part to track down any leads reasonably susceptible of being checked.

---

**2.** Under the "leads doctrine," the Government is obligated to "track down relevant leads furnished by the taxpayer—leads reasonably susceptible of being checked, which, if true, would establish the taxpayer's innocence. When the Government fails to show an investigation into the validity of such leads, the trial judge may consider them as true and the Government's

case insufficient to go to the jury." *Holland,* 348 U.S. at 135–36, 75 S.Ct. at 135. Leads, of course, must be given a sufficient amount of time before trial to permit investigation; where there is no evidence that the defendant gave leads to the Government before trial, the issue is properly left to the jury. *United States v. Vardine,* 305 F.2d 60, 65 (2d Cir.1962).

On the specific issue of antique sales, which the defendant claimed as a nontaxable source of funds, Judge Caffrey explained that the proceeds of any antique sales would not necessarily be nontaxable unless the basis was equal to or greater than the sales price. He instructed the jury that if they found that Sorrentino had failed to provide leads before trial as to when the antiques in question were originally purchased and how much was paid for them, then the Government was not required to have investigated the basis of the alleged antiques and was permitted to assume that the proceeds were taxable.

> If you find that no reasonable lead was given to the government which was adequate to enable them to investigate or to discover [Sorrentino's father's] basis and you further find antiques were, in fact, sold during '75 to '78 by Sorrentino, the government is entitled to treat the proceeds of any antique sales in those years as a long-term capital gain . . . .

Defendant complains that these instructions impermissibly shifted to him the burden of proving a basis in the antiques that he claimed to have received from his father. He argues that his father's cost basis in the antiques, though unascertainable, is irrelevant under his version of the facts: he supposedly received the proceeds of antiques before his father's death in the form of a nontaxable cash gift from his father, and received negligible gains from those sold after his father's death due to the automatic step-up in basis to fair market value under 26 U.S.C. § 1014(a). Therefore, he concludes, his father's basis in the antiques as well as his failure to give leads in that respect are both beside the point.

Defendant's contention is ingenious, but we think it reflects a misreading of the charge as given. With respect to antiques sold before his father's death, defendant's claim is essentially that he was given cash by his father: this would clearly be treated as a nontaxable gift under Judge Caffrey's enumeration of nontaxable sources earlier in the charge. Likewise, with respect to antiques sold after his father's death, de-

fendant's claim is basically that the antiques were a nontaxable inheritance and that the taxable appreciation in value between the time of the father's death and the time of sale was *de minimis*. This, too, was covered in the instruction on nontaxable income.

The situation to which Judge Caffrey's charge on basis was directed was neither of those advanced by defendant, but rather the possibility that Sorrentino had sold antiques given him by his father during his father's lifetime. In that case, the basis of the antiques would have been the same in Sorrentino's hands as in his father's, and proof of the father's basis would have been essential to determine taxability of the proceeds when the antiques were sold. "[W]here relevant leads are not forthcoming, the Government is not required to negate every possible source of nontaxable income, a matter peculiarly within the knowledge of the defendant. . . . Once the Government has established its case, the defendant remains quiet at his peril." *Holland,* 348 U.S. at 138–39, 75 S.Ct. at 136–37 (citations omitted). The burden of producing evidence of basis, in the absence of verifiable leads, would therefore lie with the defendant. *See Siravo v. United States,* 377 F.2d 469, 473–74 (1st Cir.1967); *United States v. Vardine,* 305 F.2d 60, 63 (2d Cir.1962). This in no way affected the burden of persuasion. Judge Caffrey reminded the jury immediately before giving the instruction in question that Sorrentino was "not required to prove anything in this case, including the source of his net worth . . . ." He also phrased the inference of a taxable source in permissive terms: the Government was "entitled to treat" the proceeds as taxable, and the jury was told, "you may treat all the proceeds of selling antiques as capital gains which are taxable . . . ." The jury was thus free to believe either the defendant or the Government with respect to the issue of taxable source. The instruction on basis was not erroneous.

The second objection to the jury instructions relates to Judge Caffrey's definition of proof beyond a reasonable doubt

as "proof that you would not hesitate to act and rely on in the most important of your own affairs." Defendant's objection in the present case goes to the comparison of the verdict in a criminal case with the jury's own personal decisions. We have noted similar criticisms in previous cases, *see Dunn v. Perrin,* 570 F.2d 21, 24 n. 5 (1st Cir.), *cert. denied,* 437 U.S. 910, 98 S.Ct. 3102, 57 L.Ed.2d 1141 (1978), but we have not held the language in question to be plain error. *United States v. Cranston,* 686 F.2d 56, 62 (1st Cir.1982); *United States v. Drake,* 673 F.2d 15, 20 (1st Cir.1982). We adhere to our precedent and rule that the use of such language, though appeal generating, is not plain error.

In view of our holdings concerning the jury charge, we also reject defendant's contention that the errors assigned in the charge tainted the verdict with respect to the § 7206(1) (false corporation tax return) counts.

The third challenged instruction to the jury was a ruling made during trial concerning the status of the Cape Historical Homes Trust (the Trust), in which the defendant held a 90% beneficial interest. In calculating the defendant's net worth, the Government attributed to him ownership of Trust assets (including the Bradford Street rental property formerly used as a museum, and the improved property on which defendant built his new home) to the extent of his 90% interest. The district court instructed the jury that the degree of control exercisable by the defendant was tantamount to ownership of 90% of the Trust.

 The Trust [3] was set up with Sorrentino and Warner as sole trustees; in this capacity they had complete discretion to distribute or withhold Trust income, as well as to terminate the Trust. Sorrentino and Warner were also the sole beneficiaries, holding shares in the ratio of 90 to 10 respectively. Under the Trust agreement, one-quarter of the shareholders constituted a quorum for annual and special meetings. Trustees could be appointed and removed by a two-thirds vote of the shareholders; a two-thirds vote was also required to dispose of real property held by the Trust and to alter or amend the terms of the Trust.

 It is clear as a matter of law that the defendant's 90% beneficial interest enabled him to control the distribution of Trust income and disposition of Trust assets, if necessary by constituting a shareholder quorum and removing Warner as co-trustee. Regardless of whether or how it is exercised, *Paxton v. Commissioner,* 57 T.C. 627, 633 (1972), the very existence of such powers was sufficient to trigger the provisions of 26 U.S.C. § 677(a):

> The grantor shall be treated as the owner of any portion of a trust ... whose income without the approval or consent of any adverse party [4] is, or, in the discretion of the grantor or a nonadverse party, or both, may be ... distributed to the grantor ... [or] held or accumulated for future distribution to the grantor ....

Sorrentino's power to amend or alter the terms of the Trust also amounted to a power of revocation under 26 U.S.C. § 676(a): "The grantor shall be treated as the owner of any portion of a trust ... where at any

---

3. We reject as spurious the defendant's attempt to recast the Trust as a corporation under Treas.Reg. § 301.7701–2. Four of the characteristics listed by the defendant—centralization of management, continuity of life, free transferability of interests, and limited liability—are common to both corporations and trusts, and are therefore not material in attempting to distinguish between the two forms of taxable entities. *Id.* Furthermore, although the IRS may look past the declared form of a taxable entity to determine its actual nature, the taxpayer is not free to disregard a tax characterization which he has adopted for his own purposes and for reasons sufficient to him.

*See Moline Properties, Inc. v. Commissioner,* 319 U.S. 436, 438–39, 63 S.Ct. 1132, 1133–34, 87 L.Ed. 1499 (1943).

4. An "adverse party" is defined in 26 U.S.C. § 672(a) as a "person having a substantial beneficial interest in the trust which would be adversely affected by the exercise or nonexercise of the power which he possesses respecting the trust." Warner could in no event qualify as an adverse party to an extent greater than his 10% beneficial interest, if at all. *See Laganas v. Commissioner,* 281 F.2d 731, 735 (1st Cir.1960); Treas.Reg. § 1.672(a)–1(b).

time the power to revest in the grantor title to such portion is exercisable by the grantor or a non-adverse party, or both." *See also* Treas.Reg. § 1.676(a)–1; *Schulz v. Commissioner,* 686 F.2d 490, 494–96 (7th Cir.1982).

Under either § 677(a) or § 676(a), Sorrentino could be treated as the owner of at least an undivided 90% interest in the Trust, and the Government properly allocated to him a pro rata 90% share of each item of income, deduction and credit in calculating his net worth. *See* Treas.Reg. § 1.671–3(a)(3). The court's instruction was therefore correct.

## II. EVIDENTIARY RULINGS

 Defendant also assigns as error several evidentiary rulings. He complains first of all that a summary exhibit prepared by his accountant, which showed $60,000 to $80,000 of nontaxable proceeds from antique sales in each indictment year, was improperly excluded. It is well established that summary exhibits such as net worth schedules, whether offered by the prosecution or the defense, are admissible for the convenience of the jury in understanding and evaluating evidence independently established in the record; it is equally clear that purported summaries containing assertions not otherwise supported by the record are not admissible. *Oertle v. United States,* 370 F.2d 719, 727–28 (10th Cir.1966), *cert. denied,* 387 U.S. 943, 87 S.Ct. 2075, 18 L.Ed.2d 1329 (1967); *United States v. Moody,* 339 F.2d 161, 162 (6th Cir.1964), *cert. denied,* 386 U.S. 1003, 87 S.Ct. 1347, 18 L.Ed.2d 432 (1967). Here, the prosecution's net worth schedule was based exclusively on primary evidence which was available to test the accuracy of the summary; the agent who prepared the chart was available for cross-examination concerning disputed items; and the purpose and effect of the chart were made clear to the jury. The prosecution's net worth summary was therefore admissible. *United States v. Lawhon,* 499 F.2d 352, 357 (5th Cir.1974), *cert. denied,* 419 U.S. 1121, 95 S.Ct. 804, 42 L.Ed.2d 820 (1975). By contrast, there was virtually no documentation for the defendant's alleged antique sales: both the amount of the proceeds and the assumed basis figures were taken not from documents in evidence but from the defendant's own unsupported speculation. Under the circumstances, the court acted within its discretion in excluding the defendant's potentially misleading and prejudicial exhibit. *See Oertle,* 370 F.2d 727–28; *United States v. Shavin,* 320 F.2d 308, 312 (7th Cir.), *cert. denied,* 375 U.S. 944, 84 S.Ct. 349, 11 L.Ed.2d 273 (1963); *United States v. Kiamie,* 258 F.2d 924, 932–33 (2d Cir.), *cert. denied,* 358 U.S. 909, 79 S.Ct. 236, 3 L.Ed.2d 230 (1958).

 Defendant also objects to the scope of direct and cross-examination permitted by the district court with respect to the prosecution's witness Gerald Killion, the revenue agent who prepared the Government's net worth schedule. On cross-examination, defense counsel opened the issue of why certain proceeds from flea market sales claimed by Chester Warner were not included as nontaxable funds available to the defendant on the Government's net worth schedule. On redirect, Killion explained that he had taken Warner's testimony concerning the flea market sales into consideration but had not included the sales on the schedule because there was inadequate corroborating testimony and he did not find Warner's testimony credible. The district court immediately instructed the jury that the decision whether to accept Warner's testimony as credible was to be made by the jury. It was made clear to the jury on recross that Warner's testimony, if believed, would reduce the amounts in the Government's net worth schedule by $5,000 to $10,000 per year. On recross, defense counsel also inquired why Killion had not found Warner's testimony credible, and elicited the answer that Warner had testified untruthfully before the grand jury and had shown a selective memory. On re-redirect, Killion elaborated further on his reasons for disbelieving Warner, including Warner's failure to report income on his tax returns. On re-recross, defense counsel attempted to show that prosecution witness Robert Hedrick had also failed to file income tax returns. The court ruled that Hedrick's credibility had not been raised on re-redi-

rect, Killion elaborated further on his reasons for disbelieving Warner, including Warner's failure to report income on his tax returns. On re-recross, defense counsel attempted to show that prosecution witness Robert Hedrick had also failed to file income tax returns. The court ruled that Hedrick's credibility had not been raised on re-redirect and was therefore outside the permissible scope of re-recross. This was well within the court's discretion, for "[m]ore strictly than with cross-examination, a court may limit recross to the subject matter of redirect and may exercise extensive discretion over its scope." *United States v. Honneus*, 508 F.2d 566, 573 (1st Cir.1974), *cert. denied*, 421 U.S. 948, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1975); *see also* Fed.R.Evid. 611(a), (b).

■ Defendant's next objection goes to the court's limitation of his cross-examination of another prosecution witness, Special Agent Richard Walsh. On cross-examination, defense counsel offered a photocopied excerpt from a newspaper or brochure in which the defendant was quoted as saying that he had inherited the antique collection in his home from his late father. The excerpt was admitted on the limited issue of the adequacy of the Government's pretrial investigation, and not to show the value of antiques or the truth of any quoted statement. On recross, the court permitted defense counsel to point out the defendant's quoted statement in the excerpt and question Walsh concerning his investigation, but not to read the excerpt aloud before the jury. Walsh summarized the passage in question as suggesting that Sorrentino "inherited antiques from his father when he passed on," and then described his investigation of probate and tax records, as well as his interviews with the defendant's two sisters. The court acted well within its discretion in refusing to permit defense counsel to read the excerpt aloud: such a reading was not only outside the limited purpose for which the excerpt had been admitted, but might well have led the jury to give undue weight to its unsubstantiated contents. Fed.R.Evid. 611(a).

■ The district court also sustained an objection to defense counsel's question whether Walsh had asked defense counsel himself for leads in the course of the investigation. The question was improper under the circumstances because Walsh's answer would necessarily have brought out the fact that the defendant had invoked his privilege against self-incrimination following the initial interview with Walsh. The court's ruling was, therefore, correct.

■ The court also sustained objections to defense counsel's questions whether Walsh had gone through all the records of auctioneers who might have dealt with the defendant during the indictment years. Walsh had just indicated that he had spent eight months going through bank records, and had previously indicated on redirect that it was difficult to locate dealings with specific individuals among the auctioneers' records because they were arranged by date rather than name. Although defense counsel's line of questioning was not clearly irrelevant, it was potentially cumulative and harassing, and was properly excluded. Fed.R.Evid. 611(a). The cases cited by defendant concerning the scope of cross-examination for bias are inapposite.

■ Defendant next objects to the striking of an appraisal offered by his expert witness, Robert Luddington. Luddington, manager of Jordan Marsh's interior design department, was qualified to give expert testimony on the value of antiques. Although he had visited the defendant's Bradford Street museum and seen the antiques it contained several years previously, he had never made an official appraisal of those antiques because his function at the time involved only interior decoration. At trial, with his memory refreshed by photographs of the museum rooms in their former condition, he offered an "overall" "top-of-the-hat appraisal." Luddington himself conceded that an "official" appraisal would have involved viewing each individual antique and writing a description of it, which he had not done. He stated that he was "not [in court] as an appraiser" and that he had never made an official appraisal of the museum antiques. Although he may have been technically qualified, his expertise was irrelevant: the appraisal lacked a factual foundation, and could not "assist the trier of fact to understand the evidence or to determine a fact in issue," Fed.R.Evid. 702.

■ Defendant further assigns as error four occasions on which the district court limited the defendant's own testimony on direct examination. First, the court

struck defense counsel's question whether the defendant had "some understanding as to why [Diego, an antique dealer] insisted on dealing only in cash," on the ground that even if the answer came within the state-of-mind exception to the hearsay rule, the defendant's state of mind was irrelevant because Diego was the one who insisted on cash dealing. Several witnesses had already testified that Diego dealt only in cash, and defense counsel was permitted to elicit confirmation of that fact from the defendant.

On the second occasion, the court sustained an objection to defendant's testimony concerning a conversation with a prosecution witness, former Crown & Anchor manager Hedrick, in which Hedrick allegedly had demanded a cash salary so that he could avoid reporting it. Defendant had already testified that Hedrick was responsible for instituting the Crown & Anchor's cash payroll. The court ruled that the earlier testimony had already established that the cash payroll originated with Hedrick, and that the subsequent testimony was merely cumulative.

On the third occasion, the defendant began to testify concerning an incident when Hedrick, having been fired from the Crown & Anchor, returned seeking a letter of recommendation from the defendant. The district court permitted defense counsel to elicit the essential facts: James McNearney, another Crown & Anchor employee, was confronted by Hedrick with a favorably drafted letter to type up for defendant's signature; McNearney called the defendant to tell him that the draft was not acceptable; the defendant instructed McNearney to draft a letter that he could sign; McNearney did so; and the defendant signed the resulting letter. The court cut off inquiry into the contents of Hedrick's original draft and the number of calls between McNearney and the defendant because McNearney had previously testified to the incident in detail.

The fourth challenged ruling relates to defense counsel's questions relating to defendant's testimony that he left the Crown & Anchor bookkeeping responsibilities to Hedrick and did not maintain records himself. The court sustained an objection to defense counsel's question as to what Hedrick told the defendant about his bookkeeping experience, and rejected an offer of proof that the defendant had difficulty with arithmetical computations.

The district court "retains considerable latitude even with admittedly relevant evidence in rejecting that which is cumulative, and in requiring that which is to be brought to the jury's attention to be done so in a manner least likely to confuse that body." *Hamling v. United States,* 418 U.S. 87, 127, 94 S.Ct. 2887, 2912, 41 L.Ed.2d 590 (1974). We endorse the general rule that a trial court's rulings on relevance and admissibility will not be disturbed unless there is abuse of discretion, *see United States v. Allison,* 474 F.2d 286, 288–89 (5th Cir.1973), *cert. denied,* 419 U.S. 851, 95 S.Ct. 91, 42 L.Ed.2d 82 (1974). In each of the four instances assigned as error, the district court excluded testimony on the basis of irrelevance, redundancy, or confusion. Although a different trial court might well have allowed the testimony in evidence, we cannot say that there was any abuse of discretion here, nor can we see any prejudice to the defendant.

■ Finally, defendant objects to the exclusion of an offer of proof relating to the amount of door receipts. Through the testimony of Chester Warner, defense counsel offered to prove the door receipts by using the following formula: total bar receipts from a representative week; divided by the average expenditure on drinks per customer; minus the proportion of free entry passes; multiplied by the admission charge; multiplied by the number of weeks in the summer season. The week's total bar receipt figure was documented by Crown & Anchor daily sheets, but the other figures were essentially guesses by Warner. The average expenditure on drinks per customer, allegedly $5.00, came from a "study" of unspecified nature put together by Warner and the defendant; the proportion of free entry passes was loosely estimated by Warner as 30% for the Crown & Anchor's cocktail show and 50% for the disco each evening; and the amount of the admission charge was disputed, with estimates ranging from $2.00 to $5.00. Moreover, Warner had repeatedly testified to his lack of personal knowledge concerning collection and distribution of the cash collected at the door and at the bars. The court excluded the offered proof as "sheer speculation." The ruling was entirely proper; Warner could not testify to transactions of which his personal knowledge was so tenu-

ous and for which no factual foundation had been laid. *See* Fed.R.Evid. 602.

We therefore hold that there was no error in the court's evidentiary rulings.

### III. SEATING ARRANGEMENT

At the outset of the trial, Judge Caffrey ordered the defendant to sit in the front row of the spectators' section rather than at the counsel table. Defense counsel complained that this would make it difficult to communicate with the defendant, but Judge Caffrey assured counsel that he was "free to go back any time [he] want[ed] and I won't make any comment of any kind and neither will the government counsel if you wish to confer with him.... You can talk to him any time you wish ...." Defendant now claims that this seating arrangement violated his sixth amendment right to effective assistance of counsel.

Judge Caffrey gave no particular reason for his order, but apparently relied on our decision in *United States v. Turkette*, 656 F.2d 5 (1st Cir.1981), in which we upheld against a due process challenge his requirement in a previous case that four defendants sit together in the spectators' area.[5] We specifically distinguished the spectators' section from the constitutionally suspect prisoner's dock used in Massachusetts:

> [T]he dock is a four-foot high box in which the accused is isolated.... Here, the defendants sat in the front row of the spectator's area of the courtroom, hardly a place calculated to strip an accused of his presumption of innocence in the eyes of the jury. *The defendants were no more isolated than they would have been if seated with their attorneys, as is ordinarily the case.*

*Id.* at 9–10 (emphasis added). Where special circumstances, such as the number of defendants, *see, e.g., Turkette*, make it impractical for defendants to sit at the counsel table, "as is ordinarily the case," the seating arrangement is necessarily "a matter best left to the discretion of the trial court," *id.* at 10.

The district court here articulated no reasons for refusing defendant's request to sit at the counsel table. We hold that absent reasons of security or, as in *Turkette*, practicality, a defendant has

the right to be seated at the same table as his attorney. We find, however, that no prejudice resulted here, for there is no evidence that the seating arrangement prevented or unduly hindered communication between defendant and his counsel. *See Blackwell v. Wolff*, 403 F.Supp. 759, 765 (D.Neb.), *aff'd*, 526 F.2d 1142 (8th Cir. 1975). The error was therefore harmless, *see United States v. Morrison*, 449 U.S. 361, 365, 101 S.Ct. 665, 668, 66 L.Ed.2d 564 (1981).

### IV. JENCKS ACT MATERIAL

At trial, the Government called Special Agent Richard Walsh as a witness. According to routine IRS practice, Walsh had prepared a "special agent's report" summarizing his pretrial investigation. Defense counsel requested production of the report pursuant to the Jencks Act, 18 U.S.C. § 3500, but the motion was denied.

The Jencks Act provides:

> After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

18 U.S.C. § 3500(b).

> The term "statement", as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means—
>
> (1) a written statement made by said witness and signed or otherwise adopted or approved by him[.]

18 U.S.C. § 3500(e)(1).

In order to meet the requirements of the Act, the material must be a written statement signed, adopted or approved by the prosecution witness which relates to the subject matter of the witness's testimony. In the present case, the record does not clearly show the basis for the district court's ruling. Judge Caffrey merely said,

---

5. No sixth amendment issue was raised in *Turkette;* the defendants raised no claim that they could not communicate effectively with their attorneys during the trial. 656 F.2d at 10.

"I don't think it's Jencks Act material. You have got his statement of interviews with the witnesses, but I don't think the case agent's report is the type of thing that comes under that." It is also unclear whether the district court ever examined the report to determine which portions, if any, were producible. The Government stated at trial that the report consisted mostly of a net worth analysis of the defendant and that all material concerning Walsh's interview with the defendant was already included in an interview memo made available to the defense. Defense counsel stipulated that the net worth analysis could be excised, and limited his request to the remaining material.

▮▮▮▮▮ On appeal, the Government concedes that it was error for the district court not to require production of appropriate sections of the report. We are, therefore, at a loss to understand why the Government did not produce the report on its own initiative at trial. The report is clearly a "statement" under 18 U.S.C. § 3500(e)(1), *see United States v. Cleveland,* 477 F.2d 310, 315–16 (7th Cir.1973), *cited in United States v. Del Toro Soto,* 676 F.2d 13, 16–17 (1st Cir.1982). The district court should, therefore, have examined it to determine which portions were producible; if the district court failed to do so, because it either thought the report was not a statement or assumed that the material was identical to the interview memo already turned over to the defense, this was error. *United States v. Johnson,* 521 F.2d 1318, 1320 (9th Cir. 1975).

Under the circumstances, we decline the Government's invitation to review the report and rule on it at this stage. That is not our task. *See Goldberg v. United States,* 425 U.S. 94, 108, 96 S.Ct. 1338, 1347, 47 L.Ed.2d 603 (1976). Under our case law, the appropriate procedure is to remand to the district court with instructions to examine the report and determine which portions, if any, relate to Walsh's trial testimony and are thus producible.[6] *Del Toro Soto,* 676 F.2d at 17. We further direct the district court to make the producible portions of the report available to defense counsel and then to hold a hearing to determine whether the Government's failure to turn over the report at trial mate-

rially prejudiced the defense. If there was material prejudice, a new trial must, of course, be granted. If, on the other hand, the producible portion of the report "is merely duplicative of material already in the defendant's possession," *United States v. Medel,* 592 F.2d 1305, 1316–17 (5th Cir. 1979), shows no "substantial deviation" from Walsh's trial testimony, *United States v. Sink,* 586 F.2d 1041, 1051 (5th Cir.1978), *cert. denied,* 443 U.S. 912, 99 S.Ct. 3102, 61 L.Ed.2d 876 (1979), or could not have materially enhanced defense counsel's cross-examination of Walsh, *see Del Toro Soto,* 676 F.2d at 16; *Johnson,* 521 F.2d at 1320, then the error was harmless and the verdict and judgment will stand. *See Rosenberg v. United States,* 360 U.S. 367, 371, 79 S.Ct. 1231, 1234, 3 L.Ed.2d 1304 (1959).

The case is remanded to the district court for further proceedings consistent with the foregoing. If the district court finds that a new trial is necessary, then the verdict will be set aside and the judgment of conviction reversed. If the district court finds that the error was harmless, then the verdict and judgment of the district court is affirmed.

## MEMORANDUM AND ORDER

### PER CURIAM.

In *United States v. Sorrentino* we upheld the district court on all but one point. In Part IV of our opinion we noted that, as the government itself conceded, it was error for the district court not to require production of certain sections of its report as "Jencks Act Material." The question narrowed to whether the failure to produce this material was harmless error. Accordingly, we remanded to the district court to make this determination and said:

 The case is remanded to the district court for further proceedings consistent with the foregoing. If the district court finds that a new trial is necessary, then the verdict will be set aside and the judgment of conviction reversed. If the district court finds that the error was harmless, then the verdict and judgment of the district court is affirmed.

The district court has scheduled a hearing for April 26, 1984 to make this determination.

---

6. In addition to portions of the report which are not relevant to Walsh's trial testimony, *see United States v. Medel,* 592 F.2d 1305, 1317 (5th Cir.1979), the portions which merely set out the net worth analysis introduced in the Government's net worth schedule at trial may be excised, according to defense counsel's stipulation.

It has been brought to our attention that defendant Sorrentino has fled to the Bahamas, that the district court has granted a motion to cancel Sorrentino's bail, and that a capias for his arrest has issued. Under these circumstances no purpose would be served by a hearing, and we deem Sorrentino to have waived his right to assert that the non-production of the report or any parts thereof prejudiced him in any way. *See, e.g., Molinaro v. New Jersey,* 396 U.S. 365, 90 S.Ct. 498, 24 L.Ed.2d 586 (1970) (per curiam) (escape disentitles defendant to call upon resources of court for determination of his claims).

As our opinion does not provide for a contingency such as this, it is ordered that so much of our mandate as is represented by Part IV of the opinion is recalled and vacated. The district court judgment is affirmed.