USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 98-1047

 UNITED STATES OF AMERICA,

 Appellee,

 v.

 PHILIP S. ZANGHI, II,

 Defendant, Appellant.

 ON APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS
 
 [Hon. Frank H. Freedman, Senior U.S. District Judge]

 Before

 Selya, Stahl and Lipez, Circuit Judges.
 
 
 
 
 Owen S. Walker, Federal Defender Office, for appellant.

 Patty Merkamp Stemler, with whom Corey Smith, Andrew Levchuck,
Assistant United States Attorney, Donald K. Stern, United States
Attorney, and the Department of Justice were on brief for appellee.

August 30, 1999

 
 
 

 LIPEZ, Circuit Judge. Philip S. Zanghi, II, appeals from
his conviction and sentence on twenty-three counts of securities
fraud, tax evasion, engaging in monetary transactions involving the
proceeds of unlawful activity, and violation of the money
laundering statutes. The two money laundering counts alleged that
he transferred proceeds of the securities fraud from corporate
accounts to his own use with intent to evade taxes. On appeal,
Zanghi argues that there was insufficient evidence to convict him
on the money laundering counts. The jury instructions on those
counts went beyond the statute's requirements and stated
incorrectly that the jurors could convict only if they found tax
evasion to be Zanghi's sole intent in making the transfers. Zanghi
claims that this instruction became the law of the case, and that
our review should thus ask if the evidence was sufficient to meet
the higher standard set by the erroneous instruction. This unusual
contention is important to the outcome of this appeal because the
evidence met the lower statutory standard but would not have met
the higher standard proposed by the instruction. We conclude that
the erroneous instruction should not become the law of the case,
and reject Zanghi's sufficiency challenge.
 Zanghi also protests the prosecutor's closing exhortation
to the jury to "send a message" to him from his victims, and the
court's admission of evidence of his other crimes and his flight
from justice. Finally, Zanghi claims that the court erred in
computing the sentencing range on certain counts by grouping those
counts together under the guidelines. Since this sentencing issue
requires us to resolve some apparent differences between other
courts of appeals concerning how the applicable guidelines
provision should be interpreted, we address the question in some
detail. We affirm.

 I.
 We briefly sketch the broad outlines of the facts of this
case, adding detail below as it becomes necessary to the legal
discussion. This case involves a business venture to revive the
"Indian Motocycle," a brand of motorcycle manufactured in
Springfield, Massachusetts from the early 1900s to the mid-1950s.
In 1990, Zanghi obtained an interest in the Indian trademark, not
then in use, from its owner Carmen DeLeone, with the stated
intention of reviving the manufacture of Indian Motocycles. Zanghi
then formed the Indian Motocycle Company, Inc. ("Indian"), and
moved to Springfield where he established an office and operated
the company.
 Indian was not authorized by its articles of
incorporation to issue preferred shares. Nonetheless, Zanghi sold
preferred shares in Indian to numerous investors. Zanghi also sold
options to purchase 80,000 shares of common stock in a related
apparel and accessories company Zanghi founded, which was
authorized to issue only 10,000 shares of common stock. He licenced
the Indian trademark to various businessmen who wished to sell
clothing, jewelry and other items bearing the Indian logo, and in
several cases sold "exclusive" rights to use the mark in a region
to more than one licencee. Zanghi transferred much of the funds
raised through the fraudulent sale of securities and the licencing
deals into his personal accounts. He also financed various personal
expenditures, including the rental of two houses in Avon,
Connecticut, using funds withdrawn directly from Indian accounts.
 Although he realized substantial income from these
transfers, Zanghi paid no personal income taxes in 1991 and 1992,
and only minimal amounts in 1990. He also signed and filed false
corporate income tax returns on behalf of Indian, significantly
under reporting Indian's corporate income. (Zanghi was the sole
shareholder of Indian, a subchapter S corporation, making Indian's
income taxable to him.) Zanghi frequently recorded income to Indian
and related corporations (from, e.g., the licencing arrangements
and advance royalties paid by various prospective Indian motorcycle
distributors) as loans from himself to the corporations, thus (1)
allowing the corporations to characterize the income as non-taxable
proceeds of borrowing rather than taxable corporate income, and (2)
allowing him to justify withdrawing the amounts from the corporate
accounts for his personal use, while (3) characterizing these
withdrawn amounts as loan repayments, which would not be taxable
income to him.
 Zanghi moved briefly to Raleigh, North Carolina in 1993
and then fled to Spain in January 1994 as the Indian venture began
to unravel. He was ultimately arrested in New York City. A grand
jury issued a 23 count indictment against him, charging him with
securities fraud, tax evasion (under 26 U.S.C. 7201), filing
false corporate income tax returns, engaging in monetary
transactions involving the proceeds of unlawful activity
(specifically, the securities fraud), and violation of one of the
money laundering statues (18 U.S.C. 1956(a)(1)(A)(ii)). After a
jury trial, Zanghi was convicted on all counts. This appeal
followed.

 II.
A. The Money Laundering Counts
 Counts 18 and 19 of the indictment alleged that Zanghi
twice withdrew $25,000 from Indian Motocycle Company accounts. The
indictment alleged that these funds were the proceeds of securities
fraud, and that Zanghi withdrew them knowing that the funds
represented the proceeds of some form of illegal activity with "the
intent to engage in conduct constituting tax evasion," a crime
under the federal money-laundering prohibitions of 18 U.S.C.
 1956(a)(1)(A)(ii):
 1956. Laundering of monetary instruments
 (a)(1) Whoever, knowing that the property
 involved in a financial transaction represents
 the proceeds of some form of unlawful
 activity, conducts or attempts to conduct such
 a financial transaction which in fact involves
 the proceeds of specified unlawful activity--
 (A)(i) with the intent to promote the
 carrying on of specified unlawful activity; or
 (ii) with intent to engage in conduct
 constituting a violation of section 7201 or
 7206 of the Internal Revenue Code of 1986;
 [is subject to fine, imprisonment up to twenty
 years, or both.]

Counts 18 and 19 asserted that Zanghi had "the intent to engage in
conduct constituting tax evasion" in violation of section 7201 of
the Internal Revenue Code ("Code"), the general provision of the
Code directed at preventing tax evasion:
 7201. Attempt to evade or defeat tax
 Any person who willfully attempts in
 any manner to evade or defeat any tax imposed
 by this title or the payment thereof shall, in
 addition to other penalties provided by law,
 be guilty of a felony and, upon conviction
 thereof, shall be fined not more than $100,000
 ($500,000 in the case of a corporation), or
 imprisoned not more than 5 years, or both,
 together with the costs of prosecution.

26 U.S.C. 7201.
 At trial the government produced evidence on Count 18
that Zanghi wrote a $25,000 check (No. 7943, written February 15,
1992) on an Indian account, making it payable to himself, and
deposited this check into his personal account. Zanghi wrote
"Repayment of Loan" on the check, making it appear that the check
was a repayment of a personal loan from Zanghi to Indian. The
government also produced evidence on Count 19 that Zanghi wrote a
$25,000 check (No. 7955, February 28, 1992) on the same Indian
account, making it payable to Paul Brazeau, an individual to whom
Zanghi owed large personal debts predating the Indian venture.
Zanghi wrote "Loan Repayment" on the check, making it appear that
the check was in repayment of a loan by Brazeau to Indian.
 The trial court instructed the jury that, in order to
find a violation under 1956(a)(1)(A)(ii), the jury was required
to find that Zanghi had (1) engaged in a financial transaction, (2)
which he knew involved the proceeds of securities fraud, and (3)
that "defendant conducted a financial transaction charged in the
Indictment with the intent of furthering income tax evasion." The
court then elaborated on this last element as follows:
 The third and final element which the
 government must prove beyond a reasonable
 doubt in order to convict the defendant of
 money laundering is that the defendant
 conducted a financial transaction charged in
 the Indictment with the intent of furthering
 income tax evasion. The defendant acted
 intentionally, if he acted willfully, not by
 mistake or accident and with the deliberate
 purpose of promoting, facilitating or
 assisting in carrying on the income tax
 evasion.

 In order to convict the defendant [on]
 either or both counts of money laundering you
 must agree that the defendant conducted the
 financial transaction charged in the
 Indictment with the purpose of evading taxes
 and not for any lawful or other unlawful
 purpose.

(Emphasis added.) Zanghi argues that the evidence was insufficient
to sustain a conviction on the basis of this instruction.
Specifically, he claims that the instruction mandated that the jury
find that Zanghi's sole intent in conducting the transactions in
question was to evade taxes, and that although there might have
been sufficient evidence to show that tax evasion motivated Zanghi,
there was enough evidence that he had another motive (to disguise
his theft of funds from Indian) to foreclose a jury from finding
that tax evasion was his sole intent.

B. Error in the jury instruction
 The court's instruction to the jury on the simple tax
evasion counts, Counts 13-15, alleging violations of 26 U.S.C.
 7201, included a straightforward intent instruction, telling the
jurors that "[a]n attempt to evade income tax must be willful."
Counts 18-19 alleged violations of 18 U.S.C. 1956(a)(1)(A)(ii),
which prohibits transactions involving the proceeds of criminal
activity with intent to engage in conduct constituting a violation
of section 7201, and thus incorporates the simple tax evasion
offense's elements. However, on these counts, the court instructed
the jury that it had to find that Zanghi conducted the transactions
for the sole purpose of evading taxes. Since this sole intent
instruction may indicate that the court concluded that
 1956(a)(1)(A)(ii) requires the government to prove a level of
tax-evasion intent beyond that required by 7201, we begin by
analyzing the two statutes to dispel this notion.
 Section 1956 makes it a crime for a person, knowing that
"property involved in a financial transaction represents the
proceeds of some form of unlawful activity," to conduct or attempt
to conduct such a financial transaction involving the proceeds of
specified unlawful activity "with the intent to engage in conduct
constituting a violation of section 7201 or 7206 of the Internal
Revenue Code of 1986." 18 U.S.C. 1956(a)(1)(A)(ii) (emphasis
added). On its face, the statutory language indicates that an
intent to engage in conduct that in fact violates Internal Revenue
Code 7201 is sufficient to satisfy the elements of 1956; there
is no separate requirement in 1956 itself that the defendant have
the "purpose of evading taxes . . . and not . . . any lawful or
other unlawful purpose," as the court's instruction indicated.
Section 1956 does not require that a defendant know his conduct is
a violation of the tax laws, except to the extent that 7201
contains a scienter requirement, an issue to which we now turn.
 Evidence that a taxpayer filed returns knowing that he
should have reported more income than he did is sufficient to
support a finding of willful intent to defeat and evade taxes under
18 U.S.C. 7201. See Sansone v. United States, 380 U.S. 343,
351-53 (1965); United States v. Fahey, 510 F.2d 302, 306 (2d Cir.
1974). "[I]n proving tax evasion, 'the government [does] not need
to show direct evidence of tax motivation' so long as the jury has
a sufficient circumstantial basis for inferring willfulness."
United States v. Olbres, 61 F.3d 967, 971 (1st Cir. 1995) ( 7201
case, citing United States v. Hurley, 957 F.2d 1, 4 (1st Cir. 1992)
( 7206 case)); see also McKenna v. United States, 232 F.2d 431
(8th Cir. 1956) (willfulness may be inferred from facts and
circumstances attending the act, and one may be presumed to intend
the necessary and natural consequences of his acts). "[T]he jury
may . . . infer willfulness from the fact of under reporting
coupled with evidence of conduct by the defendant tending to
mislead or conceal." United States v. Sorrentino, 726 F.2d 876, 880
(1st Cir. 1984) (citing Holland v. United States, 348 U.S. 121, 125
(1954)); see also United States v. Larson, 612 F.2d 1301, 1305 (8th
Cir. 1980) ("consistent pattern of understatement . . . may be used
to establish the essential inference of willfulness").
 Sole or exclusive intent to evade taxes is not required
under 7201. "If the tax-evasion motive plays any part in [the
affirmative willful] conduct the offense may be made out even
though the conduct may also serve other purposes such as
concealment of other crime." Spies v. United States, 317 U.S. 492,
499 (1943); see also United States v. Eaken, 17 F.3d 203, 207 (7th
Cir. 1994) (defendant also had motive of concealing embezzlement).

C. The significance of the erroneous jury instruction
 The trial court's instructions on the money laundering
counts were incorrect to the extent that they required the jury to
find that Zanghi's sole intent in making the transactions was tax
evasion. Zanghi argues that we should nonetheless measure the
sufficiency of the evidence on these counts against the standard
set by the erroneous instruction. We reject this argument.
 On appeal, we measure the sufficiency of the evidence by
asking whether the evidence, viewed in the light most favorable to
the prosecution, would permit "a rational jury to find each
essential element of the crime charged beyond a reasonable doubt."
United States v. Guerrero, 114 F.3d 332, 339 (1st Cir. 1997). Thus
we measure the proof against the "essential element[s] of the crime
charged." The terms of an indictment can raise the bar of proof for
the government to a higher level than the bare minimum required by
the terms of a criminal statute because the terms of the indictment
specify the "crime charged." Here, the indictment did not charge
that tax evasion was Zanghi's sole intent. Instead, it merely
mirrored statutory language in charging that Zanghi conducted
financial transactions with the proceeds of securities fraud "with
the intent to engage in conduct constituting tax evasion, [in
violation of 7201, knowing] that the property involved . . .
represented the proceeds of some form of unlawful activity."
 For the purpose of assessing a sufficiency challenge on
appeal, an instruction may add elements to the government's burden
of proof beyond those required by statute if that instruction has
become the law of the case. "[W]hen a cause is submitted to the
jury under an instruction, not patently incorrect or internally
inconsistent, to which no timely objection has been lodged, the
instruction becomes the law of the case." United States v. Gomes,
969 F.2d 1290, 1294 (1st Cir. 1992). In such situations, we review
for whether there was "evidence sufficient to support [the]
convictions under the law of the case," id., that is, evidence
sufficient to establish the elements required by the actual
instructions given. However, as Gomes makes clear, a "patently
incorrect" jury instruction may not become the law of the case.
Id.; see also United States v. Angiulo, 897 F.2d 1169, 1196 (1st
Cir. 1990) (instruction adding element held to be law of case where
it "was not legally incorrect"). Therefore, the patently erroneous
sole intent instruction does not establish the standard by which we
measure the sufficiency of the evidence on appeal. Instead, we
will evaluate the evidence produced against Zanghi to determine if
it would allow a rational jury to find each essential element of
the violation as charged under 1956(a)(1)(A)(ii) beyond a
reasonable doubt, disregarding the patently erroneous "sole intent"
element.

D. Sufficiency of the evidence
 Notwithstanding his argument concerning the erroneous
jury instruction, Zanghi also argues that there was insufficient
evidence to allow a rational jury to find that he had any intention
to evade taxes in conducting the withdrawals in question. He claims
that his only motive in conducting the withdrawals and labeling the
checks as loan repayments was simple embezzlement, not tax evasion.
We do not doubt that Zanghi's ruse conveniently allowed him to
conceal his securities fraud and embezzlement as well as his tax
evasion. Characterizing the withdrawals as loan repayments allowed
Zanghi to argue to Indian's accountant that those amounts were
originally deposited in Indian's account as the proceeds of loans,
not as the proceeds of the illegal sale of preferred shares in
Indian (which they in fact were). It also allowed him to conceal
the fact that he was converting these corporate funds to his
personal use.
 However, the evidence here was more than adequate to
allow a rational jury to find beyond a reasonable doubt that Zanghi
conducted the withdrawals with sufficient tax-evasive intent to
meet the willfulness standard of 7201. Zanghi paid no personal
income taxes in 1991 and 1992 and minimal amounts in 1990. His
under reporting of income in those three years totaled over one
million dollars, and he reported none of the funds he withdrew from
Indian accounts in 1990, 1991, and 1992 as personal income. When
his personal accountant informed him of a large tax liability for
1992, he explicitly declared: "no taxes, no taxes. I can't pay any
taxes." He labeled the two checks in question here as loan
repayments (to himself, and to an individual to whom he was
indebted). The government presented evidence that Zanghi routinely
disguised money in this fashion, claiming that corporate funds had
been advanced by him when they had in fact been raised through the
illegal, unauthorized sale of securities. As we have explained
above, the willfulness requirement of 7201 may be satisfied by
Zanghi's filing returns with knowledge that he should have reported
more income than he did, see Sansone, 380 U.S. at 351-53, and may
be inferred from under reporting coupled with evidence of conduct
tending to mislead or conceal, see Sorrentino, 726 F.2d at 880, or
by consistent patterns of understatement, see Holland, 348 U.S. at
139. Consistent patterns of understatement coupled with conduct
tending to conceal are both present here. A reasonable jury could
easily have found beyond a reasonable doubt that these facts, in
combination, evinced Zanghi's "intent to engage in conduct
constituting [willful tax evasion, i.e.] a violation of section
7201". 18 U.S.C. 1956(a)(1)(A)(ii). The evidence thus suffices to
support Zanghi's convictions under 1956(a)(1)(A)(ii).

 III.
 The prosecutor concluded his argument to the jury with
the following statement:
 I ask you, ladies and gentlemen, send a
 message to the defendant, send a message from
 Ms. Eva Victor, Mr. Golash, Mr. Ferris, Mr.
 Psaras, Mr. Coates, that this type of thievery
 and deception is not to be tolerated. Send a
 message to Mr. Zanghi, guilty on every count.

(Victor, Golash, Ferris, Psaras and Coates were individuals
defrauded by Zanghi.) Zanghi immediately objected, stating "that is
not the jury's function in any way, shape or form, to send any
messages to anyone, particularly the victims[] in the case," and
requested a mistrial. The court denied the request, stating that
"[t]he jury will be instructed that arguments are not evidence."
The court did so, and also instructed the jury that "it would be a
violation of your sworn duty as judges of the facts to base the
verdict upon anything but the evidence in the case." On appeal,
Zanghi argues that the prosecutor's "message" argument asked the
jury to consider an issue broader than Zanghi's actual guilt or
innocence, and invited it to brush aside any doubts it might have
about single counts by returning a verdict of "guilty on every
count."
 Assuming arguendo that this argument was inappropriate,
we conclude that the court did not abuse its discretion in refusing
to declare a mistrial.
 In deciding whether a new trial [is] required
 either because prosecutorial misconduct
 likely affected the trial's outcome or to
 deter such misconduct in the future we
 consider the severity of the misconduct,
 whether it was deliberate or accidental, the
 context in which it occurred, the likely
 curative effect of the judge's admonitions and
 the strength of the evidence against
 defendant.

United States v. Ingraldi 793 F.2d 408, 416 (1st Cir. 1986). Any
prosecutorial misconduct here was not severe. The court reminded
jurors that the arguments of counsel were not evidence. They were
told to base their decision only on the evidence. The evidence
against Zanghi on all counts was strong. We have already detailed
the evidence supporting the money laundering counts. The government
also produced financial records and testimony evidencing massive
personal and corporate under reporting of income, supporting the
personal and corporate tax violation convictions. The securities
fraud convictions were supported by the testimony of numerous
purchasers of "preferred shares" in Indian, the testimony of
purchasers of options to buy shares in Indian Motocycle Apparel and
Accessories Co., Inc., evidence of Zanghi's material misstatements
regarding the Indian venture, and evidence of his scheme to convert
corporate property to his personal use. Documentation of transfers
of funds from Indian accounts to Zanghi's personal accounts
supported the monetary transactions convictions. For all of these
reasons, any error introduced by the prosecutor's comments was
harmless.

 IV.
 Zanghi protests the district court's admission of
evidence of several instances of theft on his part, and of his
flight to Spain. We address these issues in turn.

A. Theft from Carmen DeLeone
 Zanghi purchased a half interest in the Indian trademark
from its owner, Carmen DeLeone, for one dollar in December 1989,
promising that he (Zanghi) could arrange the necessary financing to
begin manufacturing motorcycles under that trademark. During the
negotiations leading up to this sale, DeLeone disclosed that he had
an outstanding federal tax lien of $30,000. Zanghi stated that the
lien would have to be "cleared up" before the two could do
business, claimed to have a friend at the IRS who could remedy the
matter, and somehow convinced DeLeone to give Zanghi $26,000 in
cash on the pretense that Zanghi would forward it to his friend at
the IRS. Zanghi kept the money instead.
 At trial, Zanghi objected to the introduction of this
evidence as irrelevant under Fed. R. Evid. 404(b), which states
that "[e]vidence of other crimes, wrongs, or acts is not admissible
to prove the character of a person in order to show action in
conformity therewith." However, because Zanghi failed to report
these payments on his federal tax return for 1990, this evidence
was proof of unreported income, and was thus directly relevant to
Count 13, alleging a knowing gross understatement of taxable income
for that tax year in violation of 26 U.S.C. 7201. In cases where
a defendant is charged with under reporting income, there will
often be instances where evidence of his acquisition of unreported
income overlaps with evidence of other, uncharged bad acts. The
district court did not err in allowing the admission of evidence of
Zanghi's theft from DeLeone.

B. Theft from the Avon houses
 Zanghi rented two houses in Avon, Connecticut in 1991,
one for himself and one for his children. Irene Shiu, owner of the
house Zanghi rented for himself, testified that he moved some
furniture she had stored in the basement of that house into his
office at Indian during the period that he rented the house.
Although Zanghi eventually returned these items, he took with him
numerous other items belonging to Shiu after he vacated the
premises, including two televisions, an oriental rug, an oriental
vase, and some liquor bottles. Although Zanghi objected to this
testimony under Rule 404(b), the district court overruled the
objection, finding that "relevance outweighs prejudice." Malcomb
Robertson, owner of the house Zanghi rented for his children, found
that the microwave oven and stove were missing after the children
vacated the premises. Zanghi moved to strike the testimony but the
court declined to do so.
 The government argues that Zanghi's "borrowing" of
furnishings from Shiu's basement to furnish the Indian office was
part of his scheme to defraud investors by enhancing his
credibility with prospective investors with improvements to the
appearance of his office, and therefore was "closely entangled"
with the Indian scheme. The government thus claims that this
evidence was not evidence of "other crimes" introduced solely "to
prove the character of" Zanghi, as forbidden by Rule 404(b). We
find this theory of relevance plausible, and therefore conclude
that the court did not abuse its discretion in admitting this
evidence under Rule 404(b).
 The government also argues that the evidence of Zanghi's
outright thefts from Shiu goes to his "intent . . . to treat
dishonestly all" those he dealt with during the period of his
involvement with Indian. This theory of relevance is untenable,
offering proof of bad acts to highlight Zanghi's general criminal
proclivity, in direct contravention of Rule 404(b). The admission
of this evidence was erroneous. The government concedes that the
theft of items from the house rented for Zanghi's children was not
admissible because there was no evidence linking these thefts to
Zanghi rather than to his children. In light of the weight of the
admissible evidence detailing Zanghi's theft from investors and
other fraudulent activities, already noted, we conclude that both
admissions were harmless error.

C. Flight evidence
 Zanghi moved to Raleigh, North Carolina in June 1993,
renting a house for one year. He vacated the premises in January
1994, before the lease expired. The landlord testified at trial
that Zanghi called him from Spain, explaining that "he had to leave
unexpectedly and was not going to be able to honor the lease"
because he had "problems" in the United States. According to the
landlord's testimony, Zanghi also stated that the United States had
"no extradition treaty with Spain" and that "it would be a safe
haven for a period of time and that there were a lot of people from
all over the world there that could not be extradited." At trial,
Zanghi objected to this line of testimony; after a sidebar
conference, the court ruled this evidence admissible. On appeal,
Zanghi objects to the admission only on the ground that this
evidence, offered as evidence of his flight, was more prejudicial
than probative under Rule 403.
 The court did not err in admitting this evidence.
Evidence of an accused's flight may be admitted at trial as
indicative of a guilty mind, so long as there is an adequate
factual predicate for the inference that the defendant's movement
was indicative of a guilty conscience, and not normal travel. See
United States v. Hernandez-Bermudez, 857 F.2d 50, 52 (1st Cir.
1988); United States v. Grandmont, 680 F.2d 867, 869 (1st Cir.
1982); Charles Alan Wright & Kenneth W. Graham, Jr., Federal
Practice and Procedure 5181 (1999 Supp.). Here, in addition to
the testimony of the landlord, there was testimony from another
victim (Emanuel Psaras) supporting the inference that Zanghi sought
by his flight to avoid contact with his victims. Psaras testified
that when he phoned Zanghi's number in Spain, the person answering
the phone stated that Zanghi could not take the call, and Psaras
only managed to speak to him by claiming that he was a relative of
Zanghi's. Upon realizing the ruse, Zanghi answered, "You devil, you
got me." These factual predicates made it sufficiently clear that
Zanghi's departure to Spain was in fact flight indicative of a
guilty conscience, and not normal travel. See United States v.
Bartelho, 129 F.3d 663, 677-78 (1st Cir. 1997) (facts showed
relationship of flight plan to pending charges, making evidence of
flight plan "relevant to prove [defendant's] consciousness of
guilt" of those charges). Moreover, the evidence of flight as
indicative of a guilty conscience was particularly relevant given
that Zanghi denied that he had a guilty conscience, insisting that
throughout he had worked hard for the benefit of all involved with
Indian.
 
 V.
 Zanghi was convicted of two counts (18 and 19) charging
that he laundered a total of $50,000 in violation of 18 U.S.C.
 1956. He was also convicted on four counts (20 to 23) charging
that he engaged in monetary transactions with the proceeds of
securities fraud, in violation of 18 U.S.C. 1957(a). The
indictment charged that the total dollar amount involved in those
four transactions was $324,999. In calculating Zanghi's sentence,
the district court, adopting the recommendations of the probation
department in the presentence report, divided Zanghi's offenses
into three groups: one group for securities fraud offenses (counts
1 to 12), one group for corporate and personal tax offenses (13 to
17), and one group for the money laundering/monetary transaction
offenses (18 to 23). In calculating the "total amount of harm or
loss," U.S.S.G. 3D1.2(d), involved in the grouped money
laundering/monetary transaction offenses, the district court added
the amounts indicated in the indictment, listed above, to the
additional $238,000 of Indian Motocycle funds that Zanghi had
converted to his own use in 1992 (but which had not been the
subject of any charge in the indictment). This addition led to a
"total amount of harm or loss" of $612,999. On appeal, Zanghi
claims "the district court erred in adding the monetary transaction
amounts . . . to the 1956 laundering amounts and applying to the
total the much more punitive 1956 guideline, 2S1.1."
 The district court's grouping of counts 18-23 was correct
as a matter of law. The section of the Guidelines governing the
grouping of multiple counts states that "[o]ffenses covered by the
following guidelines are to be grouped together under this
subsection: . . . 2S1.1, 2S1.2, 2S1.3; . . . ." U.S.S.G.
 3D1.2(d). Guideline 2S1.1 corresponds to statutory provision 18
U.S.C. 1956 (money laundering), and 2S1.2 corresponds to
statutory provision 18 U.S.C. 1957 (monetary transactions). It is
plain that, by its literal terms, "[s]ection 3D1.2(d) requires
grouping of the offenses of money laundering (U.S.S.G. 2S1.2) and
engaging in a monetary transaction in property derived from
specified unlawful activity (U.S.S.G. 2S1.1)." United States v.
Taylor, 984 F.2d 298, 303 n.2 (9th Cir. 1993).
 There are statements in the case law to the effect that
"inclusion on [the] list [of offenses under 3D1.2(d)] does not
mean that grouping is to be automatic." United States v. Rudolph,
137 F.3d 173, 185 n.3 (3d Cir. 1998) (Becker, C.J., concurring)
(citing United States v. Seligsohn, 981 F.2d 1418, 1425 (3d Cir.
1992) and United States v. Harper, 972 F.2d 321, 322 (11th Cir.
1992)). We believe these statements question only whether it is
imperative to group all offenses covered by guidelines listed in
paragraph 2 of 3D1.2(d), and not those offenses covered by
guidelines listed in the same row of that paragraph (each row is
set off by a semicolon). For instance, in Harper, 972 F.2d at 322,
the court refused to group offenses under sections 2S1.1 and 2D1.1,
stating that "grouping is not automatic" for offenses on the list
in 2 of 3D1.2(d). Both sections 2S1.1 and 2D1.1 were on the
list, but in different rows. In Seligsohn, the offenses the court
refused to group included mail fraud, tax evasion, and bribery,
presumably guidelines sections 2F1.1, 2T1.1, and 2E5.1
respectively, all of which are on the list but in different rows.
See also United States v. Williams, 154 F.3d 655, 657 (6th Cir.
1998) (guidelines in question were sections 2F1.1 and 2T1.1, both
on the list but in different rows; court rejected the argument that
"the district court had no choice but to group the counts");
Taylor, 984 F.2d at 303 & n.2 (mandatory grouping of offenses under
sections 2F1.1 and 2S1.2 rejected; however, grouping of 2S1.1 and
 2S1.2 offenses required); United States v. Johnson, 971 F.2d 562,
576 (10th Cir. 1992) (mandatory grouping of offenses under 2F1.1
and 2S1.1 rejected). Our holding today is consistent with these
decisions. We conclude only that counts under guideline sections
2S1.1 and 2S1.2, which are listed in the same row of 2 of
 3D1.2(d), "are to be grouped" automatically.
 Since the counts were "grouped together pursuant to
3D1.2(d)," the court was required to apply the "offense guideline
that produces the highest offense level," U.S.S.G. 3D1.3(b), in
this case the money laundering guideline 2S1.1, and to aggregate
the total value of the funds involved in determining the applicable
offense level under that guideline, see U.S.S.G. 3D1.3(b). The
district court executed these calculations correctly in determining
Zanghi's sentence.
 Affirmed.