175 F.3d 48
 UNITED STATES, Appellee,
v.
Cruz ROSARIO-PERALTA, a/k/a Crescencio Cedeno-Peralta,
Defendant, Appellant.
United States, Appellee,
v.
Johnny David Diaz-Morla, Defendant, Appellant.
United States, Appellee,
v.
Ramon Antonio Javier, Defendant, Appellant.
 Nos. 97-2084 to 97-2086.
 United States Court of Appeals,
First Circuit.
 Heard March 1, 1999.
Decided April 20, 1999.
 
 Jorge A. Toro-McGowan for appellant Cruz Rosario-Peralta.
 Benjamn Angueira-Aguirre for appellant Johnny Daz-Morla.
 Zygmunt G. Slominski, by appointment of the Court, for appellant Ramn Antonio Javier.
 Michelle Morales, Assistant United States Attorney, with whom Guillermo Gil, United States Attorney, and Nelson Perez-Sosa, Assistant United States Attorney, were on brief, for appellee.
 Before TORRUELLA, Chief Judge, COFFIN, Senior Circuit Judge, and SELYA, Circuit Judge.
 TORRUELLA, Chief Judge.
 
 
 1
 Defendants Cruz Rosario-Peralta, Johnny David Daz-Morla, and Ramn Antonio Javier were apprehended after aircraft and vessels from the United States Coast Guard, Customs Service, Army National Guard, and Puerto Rico Police Department pursued a suspect vessel for hours off the coast of Puerto Rico. Defendants have asserted throughout that the government units lost track of the original vessel and intercepted their boat by mistake. Defendants were arrested, charged, convicted, and sentenced for possession of the estimated $1 billion worth of cocaine dumped into the ocean during the chase.
 
 
 2
 Defendants raise numerous claims on appeal, including a claim that the government violated their statutory and constitutional rights to discovery by refusing to disclose logs from two central communications agencies that monitored the pursuit. Defendants allege that those logs are likely to contain evidence of times and locations of the suspect vessel that make it impossible for defendants' vessel to have been the vessel spotted dumping the bales of cocaine. Because this argument is facially appealing, and because we cannot test its merits on a deeper level without delving into matters outside the record, we remand this case to the district court to review the disputed logs and determine whether they should have been disclosed and whether their nondisclosure prejudiced the defendants. Although we remand for these limited purposes, we retain jurisdiction over this appeal so that we may consider defendants' other arguments (save for their "sufficiency of the evidence" challenge, which we dispose of today) if the district court's findings make it necessary to continue.
 
 BACKGROUND
 
 3
 At approximately 1:11 a.m. on October 17, 1996, a United States Customs Service aircraft referred to as OMAHA 13 detected a vessel approximately twenty-two nautical miles off the coast of St. Thomas, U.S.V.I., traveling westbound to Puerto Rico without any lights. OMAHA 13, piloted by Pedro Rodrguez, tracked the vessel for nearly two hours to a position approximately twenty nautical miles off the coast of Puerto Rico, near the Fajardo lighthouse. Air Interdiction Officer James Sasser was also aboard OMAHA 13, operating the radar and forward looking infrared ("FLIR") surveillance and tracking system.[1] Sasser testified at trial that OMAHA 13 established a FLIR orbit of the suspect vessel at 2:13 a.m., meaning that it was orbiting the vessel at a radius of approximately one and a half to two miles in order to keep it under surveillance with the FLIR system. Sasser testified that OMAHA 13 continued FLIR orbits until the end of its role in the operation.
 
 
 4
 OMAHA 13 was running low on fuel, so, at approximately 2:30 a.m., it contacted a United States Army National Guard helicopter ("HAWK 514") that was in the area and requested assistance. HAWK 514, piloted by Captain Jose Roig, commander for the Recognizance and Interdiction Detachment ("RAID"), arrived on the scene ten to twelve minutes later. When HAWK 514 arrived on the scene, Captain Roig established visual contact with both OMAHA 13 and the suspect vessel, using night vision goggles and HAWK 514's own FLIR system. Captain Roig communicated to OMAHA 13 a description of the suspect vessel: an approximately 25-foot long vessel with two outboard engines and three persons and several bales on board. At approximately 2:50 a.m., OMAHA 13 directed HAWK 514 to illuminate the vessel with its "night sun," a 500-million candle flood light. When HAWK 514 did so, the suspect vessel accelerated and began unloading bales into the ocean. Captain Roig testified that HAWK 514 remained over the suspect vessel and continued to light the vessel until it was intercepted.
 
 
 5
 OMAHA 13 also contacted the United States Coast Guard for assistance in intercepting the vessel, and the Coast Guard cutter MONHEGAN was directed to proceed to the area at approximately 3:00 a.m. The crew of MONHEGAN quickly determined that, due to the wind and sea conditions, it would not be able to get on the scene in time to be of assistance. Nevertheless, a Customs vessel operated by Special Agent Pedro Vicens and responding to OMAHA 13's request for assistance arrived on the scene. At approximately 3:03 a.m., OMAHA 13 left the area to refuel and was replaced by another Customs aircraft, OMAHA 85. The Customs vessel then approached the suspect vessel from astern, and the Customs crew identified themselves as police officers. The suspect vessel momentarily stopped, but then accelerated again. The Customs vessel pursued and rammed the suspect vessel from astern in an attempt to disable the engines. Upon impact, defendants Rosario-Peralta and Javier jumped from the suspect vessel into the water. The Customs vessel stopped to retrieve the two individuals, while the suspect vessel sped away. The Customs crew threw lines to Rosario-Peralta and Javier, but they swam away from the vessel. After fifteen to twenty-five minutes of pursuit and discussion, the defendants boarded the Customs vessel and were placed under arrest.
 
 
 6
 While the Customs crew did this, a Puerto Rico Police Department FURA vessel that had arrived on the scene pursued the suspect vessel. The FURA vessel identified itself as the police of Puerto Rico and ordered the vessel to stop. While the vessel initially refused, it finally stopped when Agent Pedro Crespo threatened to neutralize its engines. Agent Crespo then boarded the vessel and placed its operator, defendant Daz-Morla, under arrest. Agent Crespo navigated the vessel to shore, and Special Agent Vicens, who already had custody of Rosario-Peralta and Javier, took custody of Daz-Morla.
 
 
 7
 All three defendants were taken to the Roosevelt Roads base for questioning, where they signed waivers of their constitutional rights and made several statements. Rosario-Peralta allegedly stated that they were fishing north of St. Thomas, but did not know who the owner of the vessel was or how they obtained the keys to the boat. Javier allegedly stated that they departed from the Maternillo area in Fajardo, Puerto Rico to go fishing, but that he did not know who the owner of the vessel was or how they obtained the keys to the boat. Daz-Morla allegedly stated that they departed the Maternillo area to go fishing around Culebra, that he did not know how they obtained the keys or the vessel, and that the light on the vessel burned out during the trip. A boat certificate, a tax payment receipt, and a driver's license belonging to the registered owner of the vessel were found in Daz-Morla's possession.
 
 
 8
 At approximately 4:00 a.m., the crew of the Coast Guard cutter MONHEGAN recovered 19 bales floating near the area where the helicopter had witnessed the drop-off. A Puerto Rico Police maritime unit recovered 12 more bales from the same area. Coast Guard Petty Officer Christopher St. Martin field tested the substance found inside one of the bales, and the substance tested positive for cocaine. The 31 bales contained a total of 1,040 kilograms of a substance later found by a forensic chemist to be cocaine. Later that morning, Agent Rafael Ocasio-Cruz of the Canine Unit of the Puerto Rico Police Department placed Gator, a canine specialized in detecting controlled substances, on the vessel recovered from defendants. Gator directed Agent Ocasio-Cruz to the front of the vessel and gave a positive sign for narcotics.
 
 
 9
 Defendants were charged with possession with intent to distribute cocaine while on the high seas, in violation of 46 U.S.C.App § 1903(a), (b)(1) and (f), and aiding and abetting, in violation of 18 U.S.C. § 2. Defendants were indicted on these charges on October 23, 1996, and entered pleas of not guilty. Following an eleven-day jury trial, guilty verdicts were returned against all three defendants. On September 7, 1997, the district court imposed the maximum sentences allowed by the recommended guidelines: (1) 327 months of imprisonment for defendant Rosario-Peralta; and (2) 293 months of imprisonment for defendants Javier and Daz-Morla. On September 15, 1997, defendants filed timely notices of appeal, challenging their convictions and sentences.
 
 DISCUSSION
 
 10
 Defendants raise numerous arguments on appeal. They claim: (1) that the district court's refusal to compel discovery of certain materials denied defendants their statutory and constitutional rights to discovery, due process, confrontation of witnesses, and cross-examination; (2) that the district court engaged in advocacy by interfering with the defense expert's testimony; (3) that the district court erred in allowing prejudicial testimony of a positive canine alert for narcotics; (4) that the district court erred in refusing to allow defense counsel to voir dire the canine handler outside the presence of the jury; (5) that the district court erred in allowing defendants' statements to be used against them at trial; (6) that the government failed to prove beyond a reasonable doubt that defendants possessed the bales of cocaine in question; (7) that the district court erred in allowing prejudicial testimony that the street value of the cocaine seized was one billion dollars; (8) that the district court communicated to the jury that it had already convicted defendants by issuing a gag order stating that defendants were "caught" near Fajardo; (9) that the district court erred in refusing to give an instruction on defendants' theory of the case; and (10) that the sentences of incarceration imposed by the court were excessive and contrary to the intent of the sentencing guidelines. Because we find that the district court could not have properly denied the discovery--on relevancy grounds--of one of the sets of materials requested by defendants without reviewing those materials, we do not reach defendants' other contentions at this time, save one. Rather, we retain jurisdiction over the appeal, but remand this case to the district court with instructions to review the requested materials, determine whether they should have been disclosed, and, if so, determine whether defendants were prejudiced by the nondisclosure.
 
 
 11
 Notwithstanding our focus on the discovery issue and our postponement of decisions on defendants' other claims, we do consider defendants' claim that the evidence was insufficient to demonstrate their guilt beyond a reasonable doubt. A resolution of this claim in defendants' favor would obviate the need for any further proceedings and would moot the discovery issue. Defendants argue that the government failed to prove beyond a reasonable doubt that their vessel was the vessel spotted throwing bales of cocaine into the water. Viewing the evidence, as we must, in the light most favorable to the verdict, see United States v. Noah, 130 F.3d 490, 493 (1st Cir.1997), we cannot accept the defendants' argument. The evidence in this case was clearly sufficient to support the defendants' convictions. The officers involved in the pursuit testified that they saw the bales being thrown from the suspect vessel and that they followed the suspect vessel until it was intercepted. Defendants' attacks on this testimony are mainly credibility arguments that are ill-suited to the standard of review in this type of claim. The jury heard testimony linking defendants' vessel to the bales of cocaine, and defendants have not adequately demonstrated that this testimony was false or inaccurate. Thus, the record amply supports a finding that defendants possessed the cocaine in question beyond a reasonable doubt.
 
 
 12
 The claim we focus on is defendants' allegation that the district court abused its discretion in failing to compel the government to produce the communication records and logs of two land-based central communications agencies, codenamed "Salty Dog" and "Razorback." Defendants argue that those central communications agencies maintained constant surveillance of the operation and were involved in the direction, tracking, and coordination of the government assets assigned to the operation. Several times prior to and during trial, defendants requested the records and logs of those agencies in order to attempt to cast doubt upon the testimony of the government witnesses regarding the locations of the units and vessels involved. Defendants argue that the district court erred in failing to require these records and logs to be produced.
 
 A. The Government's Discovery Obligations
 
 13
 Defendants cite three sources for the government's obligation to disclose the records and logs: (1) Fed.R.Crim.P. 16(a)(1)(C); (2) Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); and (3) the Jencks Act, 18 U.S.C. § 3500. Rule 16(a)(1)(C) of the Federal Rules of Criminal Procedure provides, in relevant part:
 
 
 14
 Upon the request of the defendant the government shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, which are within the possession, custody or control of the government, and which are material to the preparation of the defendant's defense or are intended for use by the government as evidence in chief at the trial, or were obtained from or belong to the defendant.
 
 
 15
 Fed.R.Crim.P. 16(a)(1)(C) (emphasis supplied). Because the records and logs in question were not used or intended for use by the government, they were only required to be disclosed under Rule 16(a)(1)(C) if they were "material to the preparation of the defendant[s'] defense." Additionally, in order to succeed on a claimed violation of Rule 16, a defendant must demonstrate that he has been prejudiced. See United States v. Spinosa, 982 F.2d 620, 631 (1st Cir.1992); United States v. Hemmer, 729 F.2d 10, 13 (1st Cir.), cert. denied, 467 U.S. 1218, 104 S.Ct. 2666, 81 L.Ed.2d 371 (1984).
 
 
 16
 Under Brady, exculpatory evidence is discoverable by the defendant where it "is material to guilt or punishment." Brady, 373 U.S. at 87, 83 S.Ct. 1194. In order to succeed on a Brady claim, "a defendant must show that the withheld 'evidence was exculpatory, as measured by its materiality.' " United States v. Watson, 76 F.3d 4, 7 (1st Cir.) (quoting Hemmer, 729 F.2d at 14), cert. denied, 517 U.S. 1239, 116 S.Ct. 1889, 135 L.Ed.2d 183 (1996). Information is "material" "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." See United States v. Blais, 98 F.3d 647, 651 (1st Cir.1996) (quoting United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)), cert. denied, 519 U.S. 1134, 117 S.Ct. 1000, 136 L.Ed.2d 879 (1997). A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. See Bagley, 473 U.S. at 682.
 
 
 17
 The Jencks Act requires the government to provide, upon request, any prior statements of government witnesses that relate to the subject matter of the witnesses' testimony. See 18 U.S.C. § 3500(b). A Jencks Act "statement" is: (1) a written statement made, adopted, or approved by the witness; (2) a recording (or transcription thereof) that is a substantially verbatim recital of an oral statement made by the witness and recorded contemporaneously with the making of the oral statement; or (3) a statement (or transcription thereof) made by the witness to a grand jury. See 18 U.S.C. § 3500(e). The government is required to produce those statements whether they are exculpatory or not. See United States v. Stern, 13 F.3d 489, 494 (1st Cir.1994). In order to succeed on a claimed violation of the Jencks Act, defendants must demonstrate that they have been prejudiced by the failure to disclose. See United States v. Izzi, 613 F.2d 1205, 1213 (1st Cir.) (citing United States v. McGovern, 499 F.2d 1140, 1143 (1st Cir.1974)), cert. denied, 446 U.S. 940, 100 S.Ct. 2162, 64 L.Ed.2d 793 (1980).
 
 
 18
 B. Nondisclosure of the Central Communications Agency Records and Logs
 
 
 19
 A review of the procedural history of this claim demonstrates that it is unclear exactly what grounds the district court relied on in denying this discovery request, although it appears to have found that the records and logs were irrelevant. On February 7, 1997, defendants filed a motion to compel the disclosure of, inter alia, the identities of all of the central communications agencies used in the operation and their internal logs, records, and communication tapes. At the February 10, 1997 Status Conference, the district court delayed ruling on defendants' request for these materials because the court wanted to "see what the government provides to [defendants]" before ruling on the motion to compel. The court then scheduled a status conference for two weeks later.
 
 
 20
 On February 20, 1997, the government filed a response to defendants' motion to compel, claiming that the records and tapes of the central communications agencies were not subject to disclosure on the grounds of confidentiality. The government argued that its burden to demonstrate the need for confidentiality had not yet been triggered because defendants had not yet demonstrated the need for the records and tapes.
 
 
 21
 At the February 24, 1997 Status Conference, defendants argued that the units pursuing the vessel lost sight of it and consciously avoided communicating that information on the channels that were being recorded. Defendants argued that the central communication records and tapes contained evidence that the pursuers lost sight of the vessel. Without addressing the asserted need for confidentiality, the district court found that defendants had not demonstrated that the records and tapes were necessary and denied the motion.
 
 
 22
 On May 1, 1997, defendants raised the issue again in their Joint Motion to Compel Additional Discovery and/or For Reconsideration of Motion to Compel Discovery. Defendants argued that they needed all government communications surrounding the tracking and interception of the vessel in question. Defendants attacked the government's confidentiality rationale for withholding the records, claiming that the government's surveillance techniques and the location of the central communications agencies had already been compromised by the disclosure of the FLIR videotapes, recordings, and other documents. Defendants argued that they could not assess the materiality of the records and tapes without an opportunity to review them and suggested that any remaining confidentiality concerns could be preserved by disclosing the records and tapes to the defendants under seal.
 
 
 23
 On May 8, 1997, the government filed a response to defendants' motion. In that response, the government argued that no such recordings of the surveillance operation existed and that the central communications logs contained classified information and were irrelevant. The government also noted that defendants had already been provided with the surveillance videotapes, which recorded communications between the government assets involved in the tracking and apprehension of the vessel, as well as the reports of all of those government assets. The docket does not reflect a resolution of defendants' May 1, 1997 joint motion by the district court,[2] even though defendants moved for a final status conference or pre-trial conference to address the issues.
 
 
 24
 On May 14, 1997, the third day of trial, defendants again moved to compel the records and logs of "Salty Dog" and "Razorback." Defendants claimed that Pedro Rodrguez, the pilot of OMAHA 13, testified that he was required to make position reports to "Salty Dog" every thirty minutes and that he maintained communications with his home base, "Razorback."[3] Defendants again claimed that they were entitled to inspect and review the records of "Salty Dog" and "Razorback" in order to determine whether they contained any relevant information. The district court immediately denied this motion "for the same reasons that [it] denied it before." The issue did not arise again until defendants appealed.
 
 C. Abuse of Discretion
 
 25
 We review the district court's determinations under Brady, the Jencks Act, and Rule 16 for abuse of discretion. See United States v. Brimage, 115 F.3d 73, 78 (1st Cir.), cert. denied, --- U.S. ----, 118 S.Ct. 321, 139 L.Ed.2d 248 (1997); Spinosa, 982 F.2d at 630-31. Based on the information currently in the record, we find that the district court abused its discretion in finding that the records and logs were irrelevant without first reviewing them.
 
 
 26
 Defendants' theory throughout has been that their boat could not have traveled the distance between the point where the bales were dumped and the point of defendants' interception in the time illustrated by the FLIR videotapes. Defendants argue that the locations of the vessels and aircraft at various points in time, coupled with the maximum speed of their boat under the reported conditions, make it impossible for their boat to have been the vessel that was spotted dumping the bales of cocaine. Thus, the exact position of the suspect vessel at various junctures was critical to defendants' theory and was a disputed issue at trial. Defendants argue that the logs contain the time and position of every unit in the area during the pursuit of the suspect vessel, including that of HAWK 514, the National Guard helicopter that was allegedly over the top of the suspect vessel the entire time. If the logs in fact contain such information, we do not see how they could fail to be relevant.
 
 
 27
 The government agrees that the logs contain reports of the positions of the aircraft, but argues that defendants already had this information. In doing so, the government does not argue that the information in the logs is irrelevant, only that the defendants already possessed this information in other forms. The government cites no authority for the proposition that it may deny discovery of relevant evidence on the ground that defendants already have enough evidence on that issue.[4] Even if the government were able to unilaterally deny discovery on this ground, neither we nor the district court would know for certain that defendants already possessed every relevant item of information contained in the logs. We can only pass upon such an issue after viewing those records. Defendants claim that the FLIR tape includes instances where the government agents were specifically instructed to go "off the record" so that the communications would not be recorded on the FLIR tape. Those "off the record" communications may well be included in the logs of the central communications agencies. Additionally, there is the possibility that the locations contemporaneously recorded in the logs will differ from the testimony of the pilots of the vessels or the reports filed after the incident. Defendants already contend that the positions recorded in the FLIR tapes and marked in the reports do not match up with the testimony of Captain Roig or Special Agent Vicens, and the logs could well provide evidence of other such discrepancies. In light of defendants' theory of the case, and in light of the fact that the government does not dispute that the logs contain the seemingly relevant times and locations of the units in the area, we find that the district court abused its discretion in finding the logs to be irrelevant without first reviewing them.
 
 
 28
 In addition to their relevancy arguments, defendants claim: (1) that the logs constitute "statements" required to be produced under the Jencks Act, and (2) that the logs are exculpatory Brady material because they could have been used as substantive evidence of aircraft locations and as impeachment material for the cross-examination of government witnesses regarding those locations. The district court apparently denied this discovery because it found that the logs were not relevant. It thus did not reach these more specific questions. Therefore, we have no determinations to review in considering defendants' Brady and Jencks Act arguments.
 
 
 29
 To answer all of these concerns, the government has submitted a copy of what it proffers to be the only relevant log for our review. At oral argument, government counsel was asked whether the relevant logs or records were in the possession of the government. The Court requested that government counsel obtain and preserve the logs in the event that the Court found a need for them. After oral argument, the government submitted to the Court a three-page copy of the October 17, 1996 morning log of the United States Command Center Sector for United States Customs ("Sector").
 
 
 30
 It is not appropriate for us to consider this submission. It is elementary that evidence cannot be submitted for the first time on appeal. The district court made no rulings based upon a review of the Sector log; in fact, the district court has not seen it. The log was not part of the district court record, and therefore should not be part of our analysis. Any determinations that we would make regarding the relevancy of the log, its exculpatory nature, or its characterization as a "statement" under the Jencks Act would be the first such determinations in this case. This is not our role. See Goldberg v. United States, 425 U.S. 94, 108, 96 S.Ct. 1338, 47 L.Ed.2d 603 (1976) (holding that the Court of Appeals erred in making the initial determination of whether certain materials constituted "statements" producible under the Jencks Act and expressing doubt that this function may ever be properly undertaken by a court of appeals); United States v. North American Reporting, Inc., 740 F.2d 50, 56 (D.C.Cir.1984) (citing Goldberg for the general rule that the initial determination of whether documents are producible "statements" under the Jencks Act should be made in the district court); United States v. Sorrentino, 726 F.2d 876, 888 (1st Cir.1984) (declining to examine a report to determine which portions were producible when the district court had not first done so and remanding to the district court with instructions to examine the report, determine which portions were producible, and determine whether the failure to produce those portions materially prejudiced the defense).[5]
 
 
 31
 Accordingly, we retain jurisdiction over this appeal, but decline to rule on any of defendants' other arguments until the district court has reviewed the Sector log and any other similar logs[6] and has determined whether they were material to the preparation of the defendants' defense and were therefore required to be disclosed under Rule 16(a)(1)(C).[7] If the district court determines that the logs were not discoverable under Rule 16(a)(1)(C), it shall determine whether the logs were required to be disclosed as Brady material or as Jencks Act "statements." If the district court determines that any of the logs should have been produced under Rule 16, Brady, or the Jencks Act, it shall hold a hearing to determine whether the government's failure to turn over that log materially prejudiced the defense. If the district court finds that the nondisclosure materially prejudiced the defense, a new trial must be granted. However, if, after reviewing the logs, the district court finds either that they were not discoverable or that defendants were not prejudiced by their nondisclosure, we will review those determinations for abuse of discretion and then resume our consideration of defendants' remaining contentions on appeal.[8]
 
 CONCLUSION
 
 32
 Based on the foregoing, we retain jurisdiction over the present appeal and remand to the district court for the limited purposes outlined above. The district court is granted 90 days from the date of this opinion to make the appropriate determinations. It shall do so by making written findings, and shall transmit a copy thereof to the Clerk of the court. When the district court has made its determinations, counsel for both parties shall notify the Court, at which time, if necessary, we will decide the remaining issues raised by defendants' appeal.
 
 
 
 [1]
 As described by Sasser, a FLIR system is a camera mounted on the undercarriage of an aircraft that creates images from the differences in heat of particular objects, rather than using the light spectrum. Sasser testified that the images captured by the camera are viewable on a monitor aboard the aircraft and are capable of being recorded by a videocassette recorder. Sasser recorded much, but not all, of OMAHA 13's surveillance of the suspect vessel
 
 
 [2]
 At oral argument, counsel for the government stated that the district court ruled on one of defendants' motions orally at a status conference that was not reported or recorded. Because the record contains transcripts of hearings in which defendants' other motions regarding this issue were denied, we assume that the district court denied defendants' May 1, 1997 joint motion in the unreported status conference. Due to this gap in the record, we are unable to discern the rationale for the denial of this motion, beyond the district court's earlier statements denying the similar motion to compel
 
 
 [3]
 Rodrguez actually testified that "Razorback" was the station from which he operated, but that he did not communicate with "Razorback" at all during the operation
 
 
 [4]
 Federal Rule of Evidence 403 provides that relevant evidence may be excluded if it is cumulative, but Rule 403 is a rule for admitting evidence at trial. The government points to no similar rule authorizing the denial of discovery on such grounds
 
 
 [5]
 We note that the Court in Sorrentino issued an April 10, 1984 Memorandum and Order vacating its mandate of a district court inquiry into the discovery question. See Sorrentino, 726 F.2d at 889. However, this action was taken because the Court found that Sorrentino waived his right to assert that the nondisclosure of the report prejudiced him by fleeing to the Bahamas after the opinion issued. See id. Therefore, while the Court vacated its order of remand, it did so on grounds unrelated to the merits of the question. Consequently, the authority of the original opinion is unaffected
 
 
 [6]
 We note that the government has submitted only the Sector log in an attempt to resolve this issue, even though appellants requested the logs of two separate land-based agencies: "Salty Dog" and "Razorback." Prior to making the determinations outlined in this section, the district court shall: (1) determine whether the Sector log submitted is the only such potentially relevant log, and (2) require the government to submit any similar logs so that the district court may conduct the appropriate inquiry
 
 
 [7]
 We have previously ordered such a retention of jurisdiction and limited remand in a similar situation. See United States v. Neal, 36 F.3d 1190, 1199 (1st Cir.1994) (retaining jurisdiction, but remanding to determine whether certain materials should have been produced under the Jencks Act and whether the nondisclosure was harmless error), cert. denied, 519 U.S. 1012, 117 S.Ct. 519, 136 L.Ed.2d 407 (1996)
 
 
 [8]
 Due to the ambiguity of the record, we recognize the possibility that the district court denied discovery of the logs based on the need for confidentiality, not because they were irrelevant. However, at oral argument, the government argued only that the code names listed in the logs were confidential, not the location information sought by defendants. It was suggested, without response from the government, that those code names could have been redacted. Absent more, it appears to us that this confidentiality concern could be so easily accommodated through redaction that it could not justify withholding these documents. Additionally, the government has now submitted those logs to the court and defendants apparently without redaction, thus raising the question of whether the need for confidentiality has expired. If the district court's basis for denying discovery of the logs was the government's asserted need for confidentiality, the district court shall clearly set forth its analysis on remand so that it may properly be reviewed