DECISION
This matter came on before the Court on November 19, 2010, regarding the State's Motion to Quash two (2) subpoenas issued by Defendant, or in the alternative, to have the Court conduct an in camera review of the various records requested by the Defendant in order to determine their potential relevance. The matter was before the Court again for further argument on December 16, 2010, wherein attorneys from the Department of Attorney General indicated that they had not personally viewed the personnel files and they did not have access to the personnel or disciplinary files of the State Police. The Defendant and the State have submitted memoranda supporting their positions and argued before this Court.
 Facts
Defendant, through counsel, has represented that some of the facts involved in the instant case came up in testimony taken at a violation hearing relative to a violation of a previous sentence. Defendant's counsel represented that he questioned a State Police trooper (hereinafter simply "officer") regarding the officer's testimony that he had observed Defendant attempting to break into a particular location and thereafter, the Defendant ran away. When the officer was asked why he did not chase after Defendant, the officer testified that he was unable to chase after Defendant because he was on sick leave with a leg injury. Defendant's counsel issued a *Page 2 
subpoena for the officer's medical records in order to investigate the veracity of that particular testimony. Additionally, counsel sought Rhode Island State Police records to verify the officer's medical status with the officer's department. On October 18, 2010, in an effort to comply with the Defendant's request for information, counsel for the Rhode Island Department of Public Safety provided this Court with an official response to the inquiry on those particular points. The response, consisting of State Police documents, confirmed both the injury and the sick and/or medical leave status of the officer as of June 15, 2008, which is the date of the alleged incident. The official department records, as well as the medical records in the department's possession, corroborate the veracity of the officer's testimony. Those documents were sealed in the Court file.
In addition to the above described records, Defendant's counsel, after requesting the complete disciplinary file on the officer through the discovery process, received a letter of suspension that had been sent to the officer on January 20, 2006. Defendant's counsel noted that the letter contained an express indication that the officer had been disciplined on some eighteen (18) prior occasions. Thereafter, Defendant's counsel issued a subpoena for "all personnel records" of the officer, as well as the complete medical records of the officer.
 State's Motions to Quash
The State moves to quash the subpoenas arguing that the State has provided the information to which the Defendant is entitled and beyond that, there are no valid rounds for providing information on the scope requested by the Defendant. The State also claims that the information contained within the officer's medical records, as well as the department personnel, internal affairs, and disciplinary files is privileged by virtue of a vested privacy interest of both the Rhode Island State Police and the civilian complainants whose names and identities would be *Page 3 
revealed by the disclosure. Lastly, the State claims that the release of such confidential files in the manner requested by Defendant could have far-reaching, unintended negative consequences for law enforcement agencies throughout the State of Rhode Island.
The State further suggests that in the event that this Court declines to grant the State's Motions to Quash, the most that Defendant could expect would be an in camera review of the particular material to determine whether the files contain information material to the defense.
 Defendant's Position
The Defendant requests to have counsel review the entire files in lieu of an in camera review, arguing that the Court cannot review the records as effectively as an advocate. SeeCommonwealth v. Dwyer, 849 N.E.2d 400, 421 (Ma. 2007) ("Experience has also confirmed that trial judges cannot effectively assume the role of advocate when examining records. Requiring judges to take on the perspective of an advocate is contrary to the judge's proper role as a neutral arbiter.") (Internal citations omitted).
 Further Proceedings on the Record
The respective parties augmented the record further on January 28, 2011, when counsel for the Rhode Island Department of Public Safety asserted that the State Police had a policy in effect ensuring confidentiality for all information obtained during investigation of a personnel complaint. Counsel later acknowledged that there was no policy in effect related to procedures to be employed in searching personnel files for information that may assist a defendant in impeaching an officer expected to testify during a trial. Defense counsel was given an opportunity to articulate what evidence he hoped to find in the requested materials, why he would think the materials contain such evidence, and why such evidence would be both *Page 4 
favorable to his client and material.[1] Defense counsel indicated that there were some eighteen (18) prior instances of discipline involving the officer and he is seeking to learn whether any of those instances involved untruthfulness, misidentifications of suspects by the officer, misidentifications where the officer knew he had made a mistake and failed to rectify it, or bias on the part of the officer against the Defendant or certain defendants. Defense counsel further indicated that one with unlimited resources could hire an investigator and attempt to uncover this information, but Defendant was not in such a position. He renewed his request to view the files.
 ANALYSIS Use of Rule 17(c) Subpoena in a Criminal Case
While Rule 17(c) of the Superior Court Rules of Criminal Procedure provides for the issuance of a subpoena directing production of documentary evidence, the issuance and scope of any subpoena is subject to the discretion of the Court. The Court may control the use of the subpoena through its power to rule on motions to quash or modify. Rule 17 was never intended "to give a right of discovery, in the broadest terms" in a criminal case. See State v.DiPrete, 698 A.2d 223, 226 (R.I. 1997) (citing Bowman DairyCo. v. United States, 341 U.S. 214, 220 (1951)).
Rhode Island has adopted certain standards in order to obtain information through the use of a subpoena. An individual seeking such information must show:
 (1) that the documents are evidentiary and relevant;
 (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; *Page 5 
 (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial, and that failure to obtain such inspection may tend to unreasonably delay the trial; and
 (4) that the application is made in good faith and is not intended as a general `fishing expedition.'" See State v. DiPrete, 698 A.2d 223 at 225 (1997) (quoting United States v. Nixon, 418 U.S. 683, 699-702 (1974)).
 Privilege
The materials sought by Defendant in each of the subpoenas are privileged. The rights afforded by privilege sometimes conflict with a defendant's right to conduct an effective cross-examination in all criminal matters. That right is guaranteed to the Defendant under the Sixth Amendment to the United States Constitution, applicable through the Fourteenth Amendment, and also article 1, section 10, of the Rhode Island Constitution. See Davis v. Alaska,415 U.S. 308, 315-16, 94 S. Ct. 1105, 1110, (1974). This "basic right provides the principal means by which the credibility, veracity, perception and recollection of a witness may be tested."State v. Brennan, 526 A.2d 483, 488 (R.I. 1987). Seealso State v. Merida, 960 A.2d 228, 234 (R.I. 2008);State v. Tiernan, 941 A.2d 129, 133-34 (R.I. 2008);State v. Parillo, 480 A.2d 1349, 1356-57 (R.I. 1984).
 In Camera Review
Under certain circumstances, a failure to engage in any review of privileged material relevant to a particular case will have the effect of denying a defendant his right to effective cross-examination. In State v. Kelly,554 A.2d 632, 636 (R.I. 1989), the Rhode Island Supreme Court held that a per se denial by the trial justice to order the production of a witness' Department of Children, Youth and Families records, or grant permission to issue a subpoena for same with anin camera review on the grounds of confidentiality, denied the defendant his right to effective cross-examination. The conviction in Kelly was vacated and the case was remanded *Page 6 
to the Superior Court for the trial justice to review the records in camera and to order a new trial.[2] See alsoState v. Anthony, 440 A.2d 736 (R.I. 1982).
An in camera review of privileged information strikes the requisite balance between a defendant's constitutional right to effective cross-examination and the right to confidentiality.See State v. Kholi, 672 A.2d 429, 437 (1996). The Rhode Island Supreme Court, in its analysis of the Kholi case, noted that an in camera inspection satisfied due process requirements when a trial justice turns over material information. The Kholi opinion quotes the United States Supreme Court case of Pennsylvania v. Ritchie,480 U.S. 39, 58, 107 S. Ct. 989, 1002, (1987). In Ritchie, the United States Supreme Court emphasized that a defendant's constitutional right to evidence does not include the unsupervised authority to search through the opponent's files or to make a materiality determination. Id. at 59, 107 S. Ct. at 1002.
 Officer's Medical Records
Defendant has clearly articulated a basis establishing the relevancy of some information contained in the medical records. (emphasis added). The records will serve to either corroborate the officer's earlier testimony in the context of a violation hearing, (he was unable to chase Defendant because he was out on sick leave with a leg injury), or will contradict the former testimony if the medical records demonstrate an absence of a knee injury. The contradiction will be relevant to the witness' credibility as well as his ability to accurately remember and recall a particular state of facts when he is called as an eyewitness during the contemplated trial of the charge against the Defendant. Documents in the possession of the State Police indicate that the *Page 7 
officer did in fact have an injury as of June 15, 2008, and department records confirm that he was on "leave" status within the department at that time. Once that information had been transmitted, the relevancy of any other medical record is not apparent on the record before the Court. Defendant would like to obtain and review the entire medical record of the officer but is unable to articulate any rationale as to how the medical records, other than to corroborate the information already received, become relevant to the proceeding. The actual medical records of the officer are also subject to the privilege contained in G.L. ch. 5-37.3, the Confidentiality of Health Care Communications and Information Act. Section 6.1, entitled "Court proceedings — Confidential health care information", specifically provides in subsection (d): "The court shall grant a motion to quash unless the requesting party can demonstrate that there is reasonable ground to believe the information being sought is relevant to the proceedings, and the need for the information clearly outweighs the privacy interest of the individual." There has been no such demonstration in the instant case. The State's Motion to Quash the Subpoena for the officer's medical records is granted.
 Officer's Personnel Records
The "personnel records" sought would necessarily include internal affairs and disciplinary files of the officer. As indicated earlier, the State also maintains that the information contained within the department personnel, internal affairs, and disciplinary files is privileged by virtue of a vested privacy[3] interest of both the Rhode Island State Police and the civilian complainants whose names and identities would be revealed by the disclosure. The State, therefore, maintains that any release of the personal information contained in such files would infringe on the officer's right to privacy as well as the privacy of any individual complainants. *Page 8 
The State also maintains that the broad disclosure of law enforcement disciplinary files would cause a disruption of the internal affairs process, and that the interests of justice favor nondisclosure of confidential internal affairs files and ensuing discipline; ultimately, it would have far-reaching and unintended negative consequences for law enforcement agencies throughout the State of Rhode Island.
Notwithstanding the privacy and confidentiality concerns, Defendant maintains that the above-described reference to "eighteen prior occasions" in which the officer was disciplined indicate that there may be other material in the officer's files by which the officer could be impeached. Defendant thus maintains that a failure to provide access to the material contained in the officer's personnel files impedes his Sixth Amendment right to conduct an effective cross examination.
 Government Obligation to Disclose Favorable Information to Accused
The Due Process Clause of the United States Constitution requires a prosecutor to disclose information favorable to the accused that is material to a defendant's guilt or punishment irrespective of the good faith or the bad faith of the prosecution. Brady v.Maryland, [4] 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97 (1963). Thereafter, the United States Supreme Court extended the prosecution's disclosure obligation to evidence that is useful to the defense in impeaching government witnesses, even if the evidence is not inherently exculpatory. Giglio v. United States, [5]405 U.S. 150, 153, 92 S. Ct. 763, 765-66 (1972). InGiglio, the Supreme Court noted that when the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of material evidence affecting credibility falls within the Brady rule mandating a new trial. Id.405 U.S. at 154. Subsequent cases have made it clear that even if *Page 9 
a defendant fails to actually request such favorable evidence, that fact does not leave the prosecution free of all obligation.See, e.g., United States v. Agurs,427 U.S. 97, 96 S. Ct. 2392 (1976). In Agurs, the United States Supreme Court noted that theBrady rule arguably applied in three different situations, each involving discovery, after trial, of material that was known to the prosecution but unknown to the defense. Id.427 U.S. at 103. The Court went on to delineate the three situations describing first, a case where a conviction is obtained using perjured testimony and the prosecution knew, or should have known of the perjury; second, a case where a specific request for material evidence was suppressed by the prosecution; and third, situations where the defense either makes no request at all or a non-specific type of request. Id. at 103-107. While noting that there was "no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case,"[6] id. at 109, the Court went on to note that there are situations in which evidence is obviously of such substantial value to the defense that elementary fairness requires it to be disclosed even without a specific request.Id. at 110. The Supreme Court noted during its discussion that given the need to deal with an "inevitably imprecise standard, and because the significance of an item of evidence can seldom be predicted accurately until the entire record is complete, the prudent prosecutor will resolve doubtful questions in favor of disclosure." Id. at 108.
 The Issue Regarding Whether the Suppressed Evidence is "Material"
The United States Supreme Court further expounded on theBrady requirement to disclose evidence that is both favorable to the accused and "material either to guilt or punishment."See United States v. Bagley, 473 U.S. 667 (1985). InBagley, the Court analyzed the Brady rule indicating that it was "based on the requirement of due process" and that its purpose was "not to displace the adversary system as the primary means by which truth is uncovered, but to ensure *Page 10 
that a miscarriage of justice does not occur." Thus, the Court concluded that the prosecutor was "not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." Id. 473 U.S. at 675. In two footnotes that accompany the passage, the Court noted that the rule represented a limited departure from the pure adversary model in recognition that the prosecutor's role transcends that of an adversary because he or she "is the representative not of an ordinary party to a controversy, but of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done."Id. at 675 n. 6 (quoting Berger v. United States,295 U.S. 78, 88 (1935)). The Court also indicated at the end of the other footnote that "a rule that the prosecutor commits error by any failure to disclose evidence favorable to the accused, no matter how insignificant, would impose an impossible burden on the prosecutor and would undermine the finality of judgments."Id. at 675 n. 7. The Court also abandoned the distinction between the second and third Agurs circumstances, i.e., the "specific-request" and "general or no-request" situations, and ultimately held that undisclosed evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. The Court added that a "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the case.Id. at 682.
The United States Supreme Court further analyzed the concept of materiality in the case of Kyles v. Whitely,514 U.S. 419 (1985). The Kyles Court discussed four aspects of materiality that had been previously discussed in Bagley, and indicated that a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal. Kyles, 514 U.S. at 434. The majority inKyles indicated that the fourth and final aspect ofBagley materiality to be stressed was that its *Page 11 
definition, in terms of suppressed evidence, should be considered collectively, not item by item. Kyles, 514 U.S. at 436. Given that the Bagley Court defined materiality in terms of the cumulative effect of suppression, the majority in Kyles noted that the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of "reasonable probability" is reached. This in turn means that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police. Id. at 437. The majority inKyles next indicated that whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, a failure to disclose is in good faith or bad faith), the prosecution'sresponsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable.Id. at 437-438. (emphasis added).
The importance of that holding cannot be understated because inKyles, while the defendant had been convicted of a capital offense, there were a number of facts that the police had not made the prosecutor aware of prior to the jury returning a verdict. After the capital murder conviction and death sentence were affirmed in the state courts, a petition for habeas relief was denied in the United States District Court for the Eastern District of Louisiana and that disposition was affirmed by the Fifth Circuit Court of Appeals. In reversing, the United States Supreme Court set forth and analyzed a number of facts, including favorable evidence, some of which was not disclosed even to the prosecutor until after trial.Kyles, 514 U.S. at 438.
 Procedures for Scrutinizing Officer's PersonnelFiles
The specific procedures to be employed by the courts, the government, law enforcement, and a defendant who endeavors to obtain any Brady or Giglio material contained in the personnel files of officers expected to testify in a particular case, is by no means uniform, especially with *Page 12 
regard to exactly who is assigned to scrutinize the file. The Department of Justice (DOJ) has codified the procedure to some extent through the use of a policy. See UnitedStates Attorney's Manual (USAM), Sec. 9-5.100. The entire manual and its materials can be accessed online at:http://www.justice.gov/usao/eousa/foia_reading_room/usam/. (Last visited January 28, 2011). The policy is entitled, "Policy Regarding the Disclosure to Prosecutors of Potential Impeachment Information Concerning Law Enforcement Agency Witnesses." ("Giglio Policy"). A review of the policy reveals that each investigative agency within the Department of Justice shall designate "points of contact" ("agency officials") to consult periodically with a counterpart "point of contact" ("requesting officials") within each of the DOJ prosecuting offices. The periodic consultations focus on case law from the United States Supreme Court and the Circuit Courts of Appeal, as well as rulings and practices from the District Courts that govern the definition of and disclosures of impeachment information.[7] Thereafter, when a specific prosecutor determines that it is necessary to request potential impeachment information related to an agency employee identified as a potential witness in a specific criminal case or investigation, the prosecutor is directed to notify the appropriate "requesting official" who thereafter consults with the appropriate "agency official."[8] Thereafter, the "agency official" conducts a review and will advise the "requesting official" of "(a) any finding of misconduct that reflects upon the truthfulness or possible bias of the employee, including a finding of a lack of candor during an administrative inquiry; (b) any past or pending criminal charge brought against the employee; and (c) any credible allegation of misconduct that reflects upon the truthfulness or possible bias of the employee that is the subject of a pending investigation."[9]
"Allegations that cannot be substantiated, are not credible, or have resulted in the exoneration of an employee, are generally *Page 13 
not considered to be potential impeaching information."[10] The policy goes on to detail how and when the information is provided to the prosecuting officer, the steps taken to ensure confidentiality, return (to the agency) of materials not disclosed to defense counsel by the prosecutor, retention of materials by the prosecuting office, copies to agencies, and updating the information.[11]
Notwithstanding the above-described policy, [12] some Federal Courts had earlier ruled that the District Courts do not have the power to require agency counsel to review the personnel files and, thereafter, require the agency heads to "sign-off" on the review or require the prosecutor to personally review the personnel files of several case agents. See United States v.Dominguez-Villa, 954 F.2d 562 (9th Cir. 1992) (the Court could not force the agency heads to "sign-off" on the review); and United States v. Jennings,960 F.2d 1488 (9th Cir. 1988) (ordering prosecutor to personally review personnel files was outside the scope of the court's supervisory power). See also United States v.Herring, 83 F.3d 1120 (9th Cir. 1996) (The Supreme Court's Kyles decision does not overrule Jennings).
 Application of "Materiality" to Personnel Files
Outside of the Ninth Circuit, [13] a majority of the Federal Circuit Courts have declined to grant defendants' motions for review of the agents' personnel files unless the defendants could make a prior showing of materiality. See, e.g., UnitedStates v. Navarro, 737 F.2d 625 (7th Cir. 1984);United States v. Andrus, 775 F.2d 825 (7th
Cir. 1985); United States v. Driscoll,970 F.2d 1472 (6th Cir. 1992); United States v.Lafayette, 983 F.2d 1102 (D.C. Cir. 1993). See also *Page 14 United States v. Meros,866 F.2d 1304, 1310 (11th Cir. 1989) where the Court, sitting as a three judge panel, held that a federal prosecutor was not required to search the files of local police agencies for potentially exculpatory material because the defendant had failed to make any showing that such material existed in the files.
In 2005, the United States District Court for the District of Massachusetts ruled[14] that a petitioner's Sixth Amendment right of confrontation, as well as his right to exculpatory evidence underBrady, were not violated by refusing to allow discovery of a murdered police officer's personnel file. The Court, citing findings from the previous proceedings of the same case in the Massachusetts state courts, noted that although petitioner claimed self-defense, he never placed before the Court at trial, or at any motion hearing, any evidence that the police officer was the aggressor, that the police officer took out his gun before the petitioner shot at him, that the police officer fired first, or that petitioner was aware at the time of the incident of any act of violence by the police officer. See Simpson v. Spencer,372 F. Supp. 140, 154 (U.S.D.C. Mass. 2005). The District Court noted that the Massachusetts Supreme Judicial Court (SJC) had previously taken the view that the only way the personnel records would have been relevant was if they assisted in establishing that the officer was a dangerous or violent person and that the petitioner was aware of this aspect of the officer's character.Id. at 154.
 Application of "Materiality" to Confidential Files other than Personnel Files
In United States v. Caro-Muniz,406 F.3d 22 (1st Cir. 2005), the defendant appealed his conviction, after jury trial, of six counts of bribery along with a single Court of money laundering and witness tampering.Id. at 24. The facts set forth in the case reveal that in 1999, the Federal Bureau of Investigation (FBI) had commenced an investigation relating to the possible solicitation of bribes by public officials and thereafter used a paid informant to record *Page 15 
conversations with different municipal mayors, including defendant. As a result of the informant's activities, the FBI accumulated 140 tapes of conversations with various public officials including the defendant. Id. at 24-25.
Of the 140 tapes generated by the informant's work, the FBI disclosed only seventy-one to defendant prior to trial. The defendant moved for the production of all previously undisclosed recordings on the basis that they might contain exculpatory or impeachment evidence. The district court ultimately ordered a particular FBI agent to submit a sworn affidavit within which he averred that he had received and listened to each of the recordings that had not been disclosed to the defendant and that none of those recordings related directly or indirectly to the case. The FBI agent further averred that the defendant's voice was not heard in any of them, and that neither defendant nor anyone related to the facts in defendant's case was mentioned in the recordings.Id. at 28. As a result of the district court's receipt of that affidavit, some nine (9) additional recordings and eight (8) transcripts were disclosed to the defendant. The defendant's request for the remaining recordings was denied.Id. at 28.
Affirming the lower court on appeal, the First Circuit panel noted that "[a] defendant's right to discover exculpatory evidence does not include the unsupervised authority to search through the [government's] files." Pennsylvania v. Ritchie,480 U.S. 39, 59, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987). Similarly, Brady does not permit a defendant "to conduct anin camera fishing expedition through the government's files. . . ." United States v. Pou, 953 F.2d 363, 367 (8thCir. 1992). Indeed, "[t]here is no general constitutional right to discovery in a criminal case, and Brady did not create one." Weatherford v. Bursey,429 U.S. 545, 559, 97 S. Ct. 837, 51 L. Ed. 2d 30 (1977). Instead, "to establish a violation of Brady, a defendant must provide the court with some indication that the materials to which he . . . needs access contain material and *Page 16 
potentially exculpatory evidence." United States v. Brandon,17 F.3d 409, 456 (1st Cir. 1994).
In another case, a very recent decision in the First Circuit considered the showing required to demonstrate that information within the government's control is material. See UnitedStates v. Prochilo,2011 WL 104285 (1st Cir. 2011).[15] The case involved a consolidated appeal of the cases of UnitedStates v. Prochilo, No. 09-1450, and United States v.Guerrero, No. 09-1523. The First Circuit Panel reversed United States District Court for the District of Massachusetts, which had previously granted defense motions in each case ordering very broad discovery disclosures, and thereafter, excluded the cooperating witness in each defendant's case from testifying at trial. While each defendant was charged with a different crime, [16] both defendants sought more extensive information on the main witness against them who was described as a "government cooperator."[17] Despite receiving specificBrady material from the government, each defendant moved for a wider range of disclosures relative to the exact extent of the "government cooperator's" background and relationship with the government. The decision indicates that subsequent to its initial disclosure, and prior to the District Court's decision on each motion, the government supplied additional materials to both Prochilo and Guerrero.
After granting the defendants' respective requests for even more extensive disclosure, the district court denied the government's requests for reconsideration and, pursuant to the government's requests, excluded the government's cooperating witness from testifying in each case so that immediate appeals would lie. *Page 17 
 Joseph Prochilo's case
In ruling on the government's appeal in Prochilo, the First Circuit Panel initially noted that the government was primarily responsible for deciding what evidence it must disclose to the defendant under Brady.[18] The court thereafter indicated that Prochilo's motions were both "general and speculative innature." (emphasis added). Prochilo had requested (1) details regarding the witness' work with the United States Secret Service, the Essex County Sheriff's Department, the DEA, and the FBI; (2) information regarding the other ATF cases on which the cooperator worked; (3) the witness' cooperation agreements with government agencies other than the ATF; (4) a description of other firearms seized by the government as a result of the witness' cooperation; (5) information about the cooperator's contacts with other government agencies as they related to other matters or other investigations; and (6) a list of all benefits the witness received as a result of these contacts. Prochilo maintained that the requested materials would support his claim that the witness had set him up, and they would enable him to explore bias arising from the cooperator' relationship to the government.
In reversing the District Court's order that the government disclose all cooperator-related material in its possession directly to Prochilo, the First Circuit Panel found Prochilo's arguments unpersuasive and specifically rejected his argument that only his counsel, and not the government or district court, would be able to judge what evidence would be both favorable to him and material. In reversing the district court's order, the First Circuit Panel acknowledged that many of the materials he requestedcould, depending on the facts of a particular case, contain material impeachment evidence, but the government had maintained that it had already disclosed all such evidence in Prochilo's case. At that point, it was up to Prochilo to put that representation into question by identifying specific materials he wanted the court to inspect in camera and by *Page 18 
showing them to be favorable and material. The Panel noted that since he failed to do so, there was no basis for the court to conduct an in camera inspection, much less order disclosure directly to Prochilo.
 Elvis Guerrero's case
After, Guerrero filed a motion to compel that encompassed the following categories: (1) information about the government's prior use of the cooperator, including the case name and number of each prosecution in which she had been used by any federal, state, or local law enforcement agency as a witness, a cooperating individual, or source of information; (2) all agreements between the witness and any federal, state, or local law enforcement entity, all documents reflecting payments made to her or on her behalf, and any information regarding promises, rewards or inducements (including preferential treatment) to the witness, her family, or her friends and associates; (3) the witness's arrest and conviction record and all information concerning any unauthorized criminal activity or misconduct by her, as well as any prison records; (4) information regarding any assets the cooperator had obtained from criminal activity over the last fifteen years; and (5) information reflecting her bad character or matters relevant to her credibility, including evidence of impairments, poor memory, and bias. The District Court granted the defendant's motion in its entirety, telling the government to "give him everything." The court further ruled that, to the extent that the government had doubts about particular materials, it could ask the court to review those materials in camera.
In reversing the District Court, the First Circuit Panel initially noted that Guerrero had failed to adequately articulate with specificity what evidence he hoped to find in the requested materials, why he thought the materials contained such evidence, and why the evidence would be both favorable to Guerrero and also material. The First Circuit Panel noted that Guerrero, in *Page 19 
articulating his motion in the court below, had broadly requested access to all cooperator-related materials in the government's possession and merely speculated that these materials could contain material impeachment evidence. The Panel further held that such a showing is generally insufficient to permit even an incamera review of the disputed materials, but Guerrero, in his appellate brief, did "endeavor to make the necessary particularized showing." The Panel noted that "in support of his request for the files of unrelated cases on which the cooperator worked, Guerrero says that he has evidence showing that she was paid widely-varying amounts for her work (e.g., $18,700 in one case and $100 in another)." The First Circuit Panel noted that Guerrero was arguing that the case files may reveal that the witness worked on a commission basis and the payments to her were dependent on how many defendants she implicated. Therefore, access to the case files would allow him to determine whether or not the commission theory is accurate and, if it is, would provide him with further grounds for impeachment. The First Circuit Panel remanded the case to the District Court for an initial determination on whether such a showing was sufficient to justify an in camera review.
 Application to the Instant Case
In the instant case, Defendant has been given documentation that the officer was disciplined in an administrative proceeding for untruthfulness. By virtue of that document, Defendant is now aware of the fact that the officer had been disciplined on some "eighteen prior occasions" with no information regarding what those occasions were about. As recently as January 28, 2011, Defendant, through counsel, has articulated that he is seeking to learn whether any of those other "eighteen prior occasions" involved untruthfulness, misidentifications of suspects by the officer, misidentifications where the officer knew he had made a mistake and failed to rectify it, or bias on the part of the officer against the Defendant, or certain defendants. *Page 20 
In considering and balancing the Defendant's interests against the privacy concerns of both the individual complainants and the officer's personnel files, this Court initially notes that the Rhode Island State Police may be under no statutory duty to create such records as are presently maintained; however, to the extent such records do exist, they may be subject to disclosure. SeeDirect Action for Rights and Equality (DARE) v. Gannon,713 A.2d 218, 225 (R.I. 1998). The DARE case involved a request for certain records of the Providence Police Department made pursuant to the Access to Public Records Act, (APRA), set forth in G.L. ch. 38-2. The police actually maintained such records pursuant to the terms of a consent judgment entered in the United States District Court for the District of Rhode Island in a case brought against the City of Providence.
The absence of a particular statute or consent judgment in the instant case may not necessarily mean that there is no obligation to keep personnel records containing information relative to disciplinary matters. The Rhode Island State Police are one of seven agencies in the State of Rhode Island receiving accreditation from the Commission on Accreditation for Law Enforcement Agencies, Inc., (CALEA ®). The Commission was created in 1979 as a credentialing authority through the joint efforts of law enforcement's major executive associations and information may be accessed through its website, http://www.calea.org. (last visited 2-8-11). Information available on the clients of the Commission give the appearance that the entity is international in scope. The Court notes that the requirement to keep personnel records containing information relative to disciplinary matters, as well as internal affairs files relative to the investigation of disciplinary matters, is most likely a condition of keeping the accreditation. The Court is also aware of the State Police's internal investigation policy and procedure as set forth in General Order — 3C which has been exchanged among the Court and *Page 21 
counsel. The procedure contains a confidentiality policy for information contained in such records.
The Court is also sensitive to other factors related to the acquisition and storage of such files and information including the expectaton of privacy of both complainants and individual officers, the effect that the security and confidentiality of such files has on the morale of the officers within the organization, and the potential incentive to forego keeping such information on file if extensive or unlimited access to them is routinely granted. This Court is aware that "[I]t is extremely important for the police to gain and preserve the public trust, and maintain public confidence in the integrity of police officers. . . ." SeeClancy v. McCabe,441 Mass. 311, 328, 805 N.E.2d 484, 497 (2004). (Ireland, J., dissenting). Furthermore, "The image presented by police personnel to the general public. . . . `also permeates other aspects of the criminal justice system and impacts its overall success."'See Civil Service Commision v. Johnson,653 N.W.2d 533, 538 (Iowa 2002) (quoting Fort Dodge v. CivilService Commission, 562 N.W.2d 438, 440 (Iowa Ct.App. 1997)).
The Defendant's interest in a fair trial and impartial trial further augments that of the public and cannot be understated.See State v. Verde,66 R.I. 33, 49 17 A.2d 39, (R.I. 1940), ("The impartiality, purity and strict regularity of jury trials, especially in capital cases, are of the highest importance to the peace, welfare, harmony and security of the community.) (quoting Commonwealth v. Roby, 12 Pick. 496, 1832 WL 2503 (Mass. 1832).
 Conclusion
With defense counsel's particularized focus during the January 28, 2011 proceeding, specifically whether any of the eighteen other instances of discipline to the officer involved untruthfulness, misidentifications of suspects by the officer, misidentifications where the officer *Page 22 
knew he had made a mistake and failed to rectify it, or bias on the part of the officer against the Defendant or certain defendants, the Court finds that such information would be helpful to Defendant in impeaching the officer, who may be the only witness against Defendant if the case proceeds to trial.
The Court will deny the motion to quash but will narrow the scope of Defendant's subpoena in light of the interests of the individual complainants, officers, and organization in the internal affairs files. The Court finds that interest to be significant. The subpoena is narrowed from its present request for "all personnel records" of the officer, and instead the Court directs that there be an initialin camera review of the letters reflecting imposition of discipline on the officer relative to the eighteen prior occasions which have been referenced in the documents released to this point. To the extent necessary for the initial in camera review, the Court will allow redaction of any names where disclosure would unduly compromise the privacy interest protected by the police policy as set forth in General Order — 3C. The Court orders that General Order — 3C be enclosed with any of the documents sent for the initial in camera review if any names are redacted from such documents. The initial in camera review is expressly subject to the Court's authority to order further disclosure, either directly to defense counsel, or to be conducted pursuant to a further in camera review. Such further disclosure may consist of the disclosure of additional documents, or of identities of any redacted names deemed to be necessary for a fair trial, or in the interest of justice considering the competing interests at stake in the case now pending.
Any further disclosure shall be on such terms as the Court finds to be in the interests of justice and shall be ordered only after the parties have had an opportunity to be heard on the particular issue. *Page 23 
Finally, as indicated earlier in the Court's Decision, the State's Motion to Quash Defendant's Subpoena for the complete medical records of the officer is granted.
The Court shall prepare an appropriate order for entry.
[1] See, e.g., United States v.Rosario-Peralta,175 F.3d 48, 55-56 (1st Cir. 1999), however the precise words used to illustrate the kind of showing required have differed from case to case. Some examples are apparent in the cases discussed by the First Circuit Panel Decision in the consolidated appeals of the cases of United States v. Prochilo,2011 WL 104295 (1st Cir. 2011), involving consolidated appeals of Joseph Prochilo, No. 09-1450, and Elvis Guerrero, No. 09-1523, from the United States District Court of the District of Massachusetts, which decision is discussedinfra.
[2] In Kelly, the Supreme Court indicated that if a failure to conduct any review were the only issue involved in the case, the case would be remanded back to the Superior Court with instructions that the Court produce and review in camera the requested records regarding the witness and, if the Court found that the records would create a basis for an attack on the witness' credibility, the defendant would be granted a new trial. However, if after such review, the records did not reveal any information that adversely affected the witness' credibility, the conviction would be affirmed. This alternative was not available due to other errors during trial so a new trial was ordered on appeal.
[3] In 1980, the State of Rhode Island created a statutory right to privacy as well as an action for a deprivation of that right.See P.L. 1980, ch. 403, § 1 enacted as a part of the General Laws of the State of Rhode Island as § 9-1-28.1.
[4] Commonly known as "Brady" material.
[5] Commonly known as "Giglio" material.
[6] The Supreme Court was quoting from Moore v. Illinois,408 U.S. 786, 795 (1972).
[7] USAM ¶¶ 2 and 3 of Sec. 9-5.100.
[8] Id. at ¶ 4.
[9] Id. at ¶ 5.
[10] Id. at ¶ 6.
[11] Id. at ¶¶ 6-10.
[12] The materials set forth are contained in the current edition of the U.S. Attorney's Manual, which was comprehensively revised in 1997 according to the online materials.
[13] See United States v. Henthorn,931 F.2d 29 (9th Cir. 1991) (defense need not make any prior showing that impeachment material will be found in agent's personnel file).
[14] The Court issued a "Memorandum and Order on Petition for Habeas Corpus Relief."
[15] The Decision was dated January 13, 2011.
[16] The government charged Prochilo with being a felon in possession of a firearm, and Guerrero with conspiring to distribute cocaine, attempting to possess cocaine with intent to deliver.
[17] The court's decision does not indicate whether the witness against each defendant was the same person.
[18] The District Court was citing Pennsylvania v.Ritchie, 480 U.S. 39 at 59-60 (1987).
 *Page 1